IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| WILLIAM C. FLOYD JR., | |
| Petitioner, | **8:13CV195** |
| vs. | |
| SCOTT FRAKES, Director of the Nebraska Department of Correctional Services; and BRAD HANSEN, Warden Tecumseh State Correctional Institution; | **MEMORANDUM AND ORDER** |
| Respondents. | |

This matter is before the court on Petitioner William C. Floyd, Jr.'s ("Petitioner" or "Floyd") Petition for Writ of Habeas Corpus. (Filing No. 127 & Filing No. 131.) For the reasons that follow, Petitioner's habeas petition is denied and dismissed with prejudice.

## I. CLAIMS

Summarized and condensed, and as set forth in the court's order filed November 9, 2017 (Filing No. 136), Petitioner asserted the following claims that were potentially cognizable in this court:

| | |
|---|---|
| Claim One: | Petitioner was denied effective assistance of counsel *because* trial counsel **(1)** failed to investigate Carrissa Flanagan, Maurice Thomas, and men hired to retaliate against Maurice Davis and his family as possible suspects and failed to introduce that evidence at trial (Filing No. 127 at CM/ECF pp. 17, 18-19, 33, 34-35); **(2)** failed to interview Becky Breyman, Felicia Williams, and Coney Stephens (*Id*. at CM/ECF p. 18); **(3)** failed to subpoena Traeshawn Davis to testify at trial, or alternatively, |

introduce his prior trial testimony (*Id.* at CM/ECF pp. 20, 33); **(4)** failed to properly investigate the crime scene and the Omaha Police Department investigation in order to effectively impeach Shantelle Vickers' testimony at trial (*Id.* at CM/ECF pp. 20-21, 36); **(5)** failed to interview Steven Lindsey[1] and subpoena him to testify at trial (*Id.* at CM/ECF pp. 22, 33); **(6)** failed to investigate Pierce Armstead and subpoena him to testify at trial (*Id.* at CM/ECF pp. 22-23); **(7)** failed to investigate Petitioner's "unusual gait" and eyesight (*Id.* at CM/ECF p. 24); **(8)** failed to order any ballistic examination or evaluation of trajectory and residue soot of the bullet removed from the windowsill (*Id.* at CM/ECF p. 26); **(9)** failed to subpoena Shantelle Vickers' telephone records from October 7 and 8, 2003 (*Id.*); **(10)** failed to interview Howard Banister (*Id.* at CM/ECF p. 27); **(11)** failed to adequately investigate the prior bad act that occurred on April 24, 2003 (*Id.*); **(12)** failed to present truthful evidence at the pretrial hearing and at trial about the April 24, 2003, prior bad act (*Id.* at CM/ECF p. 28); **(13)** failed to challenge in a motion to suppress the validity of Shantelle Vickers' affidavit as probable cause for the arrest warrant (*Id.*); **(14)** failed to conduct proper voir dire when counsel failed to remove certain jurors for cause or with peremptory strikes and used peremptory strikes in a gender-biased manner (*Id.* at CM/ECF pp. 29-31); **(15)** failed to move for a mistrial or request a curative instruction after a juror discussed his opinion of Petitioner's guilt in front of the other jurors during voir dire (*Id.* at CM/ECF p. 30); **(16)** failed to object when the prosecutor used peremptory strikes in a gender-biased manner (*Id.* at CM/ECF p. 31); **(17)** prohibited Petitioner from testifying (*Id.* at CM/ECF pp. 27, 32); **(18)** failed to subpoena Shantelle Vickers'

---

[1] In its prior order setting forth the claims (Filing No. 136), the court spelled Lindsey as "Lindsay." Both the Nebraska state courts and Floyd spell his name "Lindsey." Therefore, the court will use "Lindsey" throughout this Memorandum and Order.

medical records to impeach her testimony at trial about Petitioner's acts of domestic violence against her (*Id*. at CM/ECF p. 35); **(19)** failed to investigate Shantelle Vickers' abuse of Petitioner (*Id*. at CM/ECF pp. 35-36); **(20)** failed to subpoena Officer Allen Wagner to testify at trial (*Id*. at CM/ECF p. 36); **(21)** failed to effectively cross-examine Ruth Buie about Petitioner's clothing, the exact times he was with her that day, his "unusual gait," and his glasses (*Id*. at CM/ECF p. 37); **(22)** failed to effectively cross-examine Shawn Smith about Petitioner's "unusual gait" and glasses (*Id*.); **(23)** failed to cross-examine Petitioner's mother about his "unusual gait" (*Id*. at CM/ECF p. 38); **(24)** failed to cross-examine Shantelle Vickers and Andre Jack about whether the suspect moved in a unique way or wore glasses (*Id*.); **(25)** failed to investigate the location of the missing video and audiotape of Shantelle Vickers' first statement to law enforcement (*Id*. at CM/ECF p. 39); **(26)** failed to assert a *Brady* violation with regard to the missing video and audiotape (*Id*.); **(27)** failed to adduce at trial the discrepancies between the truth and Shantelle Vickers' first statement to law enforcement (*Id*.); **(28)** failed to investigate the location of the photo array that law enforcement displayed to Andre Jack (*Id*. at CM/ECF p. 40); **(29)** failed to assert a *Brady* violation with regard to the photo array (*Id*.); **(30)** failed to object to Exhibits 145 and 146 and testimony about them (*Id*. at CM/ECF p. 44); **(31)** failed to impeach Detective Christopher Perna's testimony at trial with evidence that Petitioner escaped from him during the April 24, 2003, prior bad act (*Id*. at CM/ECF p. 45); **(32)** failed to exclude or remedy Shantelle Vickers' testimony that she and Petitioner had hundreds of fights (*Id*.); **(33)** failed to object to erroneous jury instructions (*Id*. at CM/ECF pp. 45-46); **(34)** failed to object to prosecutorial misconduct during closing arguments and the direct examination of Shantelle Vickers (*Id*. at CM/ECF pp. 46-48); **(35)** made an improper opening statement "basically telling the jury that all the evidence against [Petitioner] was true" (*Id*.);

**(36)** failed to stay the proceedings with respect to Count III, felon in possession of a firearm, for review in the federal courts ([Filing No. 131 at CM/ECF p. 10](.) ; **(37)** failed to object to prejudicial testimony from Shantelle Vickers regarding two threatening phone calls from Petitioner (*Id*.); **(38)** failed to call Carolyn Floyd as a character witness (*Id*.); and **(39)** failed to sequester jurors (*Id*.).

Claim Two:    Petitioner was denied effective assistance of counsel *because* counsel failed to raise on direct appeal **(1)** prosecutorial misconduct because the State withheld from Petitioner the police report about the video and audiotape of Shantelle Vickers' first statement to law enforcement and the photo array that law enforcement displayed to Andre Jack; **(2)** sufficiency of the evidence for Petitioner's convictions of first degree murder and manslaughter of an unborn child[2]; **(3)** prosecutorial misconduct because the State introduced the 911 tape into evidence at trial; **(4)** prosecutorial misconduct because the State presented false and misleading evidence to the jury; **(5)** judicial misconduct because the trial court overruled trial counsel's motion to remove a juror for cause who formed a preconceived opinion about Petitioner's guilt; **(6)** judicial misconduct because the trial court erroneously instructed the jury; **(7)** insufficient notice of the nature and cause of the accusation during Petitioner's arraignment on the second amended information; **(8)** the unconstitutionality of Petitioner's conviction and sentence for Count III, felon in possession of a firearm; **(9)** judicial misconduct for imposing a sentence on Count III when the State failed to offer documentary evidence that the underlying offense was a felony; **(10)** prosecutorial misconduct because law enforcement lacked probable

_____

[2] This claim includes Petitioner's claims that counsel failed to raise (1) that the State failed to prove that the manner of death was homicide, and (2) judicial misconduct because the trial court accepted the jury's guilty verdict.

4

cause to arrest Petitioner; and **(11)** judicial misconduct because the trial court judge refused to recuse himself "and denied counsel during hearing to litigate;" **(12)** Petitioner's assigned errors on both direct appeals as federal constitutional claims (Filing No. 127 at CM/ECF pp. 49-50); [and] **(13)** payment of certain state witnesses to testify against Petitioner (Filing No. 131 at CM/ECF p. 15).

Claim Three: Petitioner was denied the constitutional right to a fair trial *because* **(1)** the prosecutor and trial counsel used peremptory strikes in a gender-biased manner (Filing No. 127 at CM/ECF pp. 31-32); **(2)** the State committed prosecutorial misconduct when it withheld from Petitioner the video and audiotape of Shantelle Vickers' first statement to law enforcement and the photo array that law enforcement displayed to Andre Jack in violation of *Brady* (*Id*. at CM/ECF pp. 39-40); **(3)** Detective Christopher Perna committed misconduct when he coached Shantelle Vickers during her second statement to law enforcement and altered the crime scene diagram to match Vickers' "new" version of events (*Id*. at CM/ECF pp. 23, 25, 40-44); **(4)** the State committed prosecutorial misconduct when it permitted evidence of the altered crime scene at trial (*Id*. at CM/ECF p. 44); **(5)** the trial court erroneously instructed the jury (*Id*. at CM/ECF pp. 45-46); and **(6)** the State committed prosecutorial misconduct during closing arguments and direct examination of Shantelle Vickers (*Id*. at CM/ECF pp. 46-48).

Claim Four: Petitioner was denied effective assistance of counsel *because* trial and appellate counsel failed to maintain sufficient client contact with Petitioner to enable Petitioner "to obtain or pursue significant avenues which would have led to exculpatory information" and "to allow for [Petitioner] to make decisions which would affect his opportunity to preserve claims." (*Id*. at CM/ECF pp. 51-54.)

Claim Six:[3]    Each of Petitioner's aforementioned claims and their subparts constitute a violation of his rights to Due Process, Equal Protection, and fair process under the Fourteenth Amendment. (*Id*. at CM/ECF p. 55.)

Claim Seven:    Petitioner has presented a claim of Actual Innocence as a gateway through any type of procedural default. (Filing No. 131 at CM/ECF p. 15.)

(Filing No. 136 at CM/ECF pp. 2-7.)

## II.  BACKGROUND

### A.  Convictions and Sentences

The court states the facts as they were recited by the Nebraska Supreme Court on direct appeal following retrial. *See State v. Floyd*, 277 Neb. 502, 763 N.W.2d 91 (2009) (Filing No. 9-5). *See Bucklew v. Luebbers*, 436 F.3d 1010, 1013 (8th Cir. 2006) (utilizing state court's recitation of facts on review of federal habeas petition).

On July 30, 2004, Floyd was charged with first degree murder, manslaughter of an unborn child, and being a felon in possession of a weapon. Floyd was originally convicted in 2005 of these charges; however, the murder and manslaughter convictions were reversed on appeal by this court as the result of improper communication between the jury and a bailiff.[4] [*State v. Floyd*, 272 Neb. 898, 725 N.W.2d 817 (2007), *disapproved*, *State v. McCulloch*, 274 Neb. 636, 742 N.W.2d 727.]

_____

[3] The court previously dismissed Claim Five (and Claim Six as it pertains to Claim Five). (*See* Filing No. 128 at CM/ECF p.6; Filing No. 136 at CM/ECF p. 7.)

[4] The Nebraska Supreme Court affirmed Floyd's conviction for felon in possession of a firearm. (Filing No. 9-4 at CM/ECF p. 18.)

Floyd was retried. Following a jury trial, he was again convicted of first degree murder and manslaughter of an unborn child. Floyd was sentenced to life imprisonment on the murder conviction and 20 to 20 years' imprisonment on the manslaughter conviction.

The charges against Floyd arose out of the shooting death of Destiny Davis, who was pregnant at the time of her death. The evidence establishes that on October 7, 2003, Davis and several other individuals, including Davis' sister, Shantelle Vickers, were in the living room in a home in Omaha, Nebraska. Just before 10:30 p.m., Vickers left the living room for the bathroom. The other individuals, including Davis, remained in the living room. While in the bathroom, Vickers heard gunshots. Those gunshots were fired from outside the living room window. Davis and two others were hit; Davis and her unborn child were killed. Vickers testified that after hearing the gunshots, she looked out the bathroom window and saw a man she identified as Floyd outside the house.

The State's theory of prosecution was that Vickers, who had previously been romantically involved with Floyd, was the intended victim of the shooting. In support of this theory, Vickers testified as to her combative relationship with Floyd, including specific incidents in which Floyd acted in a violent manner toward her. In particular, Vickers testified to four separate incidents: one on January 21, 2003; another sometime in the fall of 2003; one on October 6, 2003; and one in the afternoon on October 7, 2003, the day of the shooting. Floyd objected to the introduction of all but the October 7 incident. Floyd's motion in limine was denied. The court concluded that the prior history of violence went not to Floyd's propensity for violence, but to Floyd's motive or intent to commit the crimes charged.

Voir dire in this case was held on August 20 and 21, 2007. At the conclusion of the first day of voir dire, the jury was admonished to not "read, view or listen to any reports about this case . . . . If any accounts of this case do come to your attention, you must immediately disregard them."

An Omaha World-Herald newspaper article regarding the trial was published during the jury selection process and appeared in both the August 20, 2007, evening edition and the August 21 morning edition of the newspaper. Based upon the publication of the article, Floyd motioned for a mistrial. The court reserved ruling on the motion and conducted an inquiry into the jury pool's exposure to the article.

During its inquiry, eight members of the jury panel admitted exposure to the article in some form. Each member of the panel was questioned separately. Four prospective jurors were struck for cause at the conclusion of their individual questioning; another two prospective jurors were excused for cause at the conclusion of all questioning. At that time, the district court also denied Floyd's motion for mistrial.

Floyd also objected to the two remaining members of the panel, both of whom eventually sat on the jury. The district court denied those motions. The questioning of juror D.W. established that he saw the newspaper of a fellow prospective juror and noticed a headline that contained the words "Floyd," "retrial," and "2003." D.W. indicated that once he saw the name and year, he "just looked down," and that he could not tell what the exact headline was and had no idea why a retrial was necessary. As for juror F.W., she testified that she was skimming the newspaper and saw the name "William Floyd" and that she "quickly put it [the newspaper] into the trash, I mean, as fast as I probably have in my life." F.W. denied seeing or reading any other information from the article.

## B.  Direct Appeal Following Retrial

Floyd appealed his convictions and sentences to the Nebraska Supreme Court on January 4, 2008. (Filing No. 9-2.) Floyd was represented both at trial and on direct appeal by the same lawyer. Floyd argued that the state district court erred in (1) admitting evidence of specific incidents of Floyd's abuse of Vickers; (2) basing its ruling on the admissibility of evidence pursuant to Neb. Evid. R. 404, Neb. Rev.

Stat. § 27-404 (Reissue 2008), in part on testimony from a prior rule 404 hearing; (3) using an incorrect definition of "clear and convincing" in deciding whether the State met its burden under rule 404; (4) refusing to admit evidence of specific incidents of violence by Vickers toward her former and current husbands; and (5) denying Floyd's motion to strike or motion for mistrial due to the fact that several prospective jurors were exposed to a newspaper article regarding Floyd's retrial. *Floyd*, 277 Neb. at 506, 763 N.W.2d at 97. (Filing No. 9-5 at CM/ECF pp. 4-5.)

In a written opinion filed April 3, 2009, the Nebraska Supreme Court rejected Floyd's claims on the merits. *Floyd*, 277 Neb. at 507-16, 763 N.W.2d at 98-103. (Filing No. 9-5 at CM/ECF pp. 5-13.) As the court found no merit to Floyd's assigned errors, the court affirmed his convictions and sentences. *Floyd*, 277 Neb. at 516, 763 N.W.2d at 103. (Filing No. 9-5 at CM/ECF p. 13.) The Nebraska Supreme Court overruled Floyd's motion for rehearing and issued its mandate on June 30, 2009. (Filing No. 9-2 at CM/ECF p. 3.)

## C. Postconviction Action

Floyd filed a verified motion for postconviction relief on June 21, 2010. (Filing No. 31-2 at CM/ECF pp. 49-130; Filing No. 31-3 at CM/ECF pp. 1-21.) On June 2, 2011, Floyd filed an amended motion for postconviction relief. (Filing No. 10-3 at CM/ECF pp. 10-159; Filing No. 10-4 at CM/ECF pp. 1-9.) Floyd alleged instances of trial court error and a litany of ineffective assistance of counsel claims and challenged the constitutionality of his convictions and sentences. (Filing No. 10-3 at CM/ECF pp. 10-159; Filing No. 10-4 at CM/ECF pp. 1-9; Filing No. 10-6 at CM/ECF pp. 101-15.)

The State filed a motion to dismiss Floyd's amended postconviction motion without an evidentiary hearing. (Filing No. 10-2 at CM/ECF pp. 21-37.) After reviewing the files and records, the state district court granted the State's motion to dismiss Floyd's amended postconviction motion without an evidentiary hearing.

9

([Filing No. 10-6 at CM/ECF pp. 101-16](#).) In a written order, the court found that Floyd's claims concerning the constitutionality of his convictions and the alleged errors of the trial court were procedurally barred because they should have been argued on direct appeal. (*Id.* at CM/ECF p. 115.) On the claims of ineffective assistance, the district court found that Floyd failed to sufficiently plead prejudice and that the record affirmatively established that Floyd was not prejudiced by any of the allegations of ineffective assistance. (*Id.* at CM/ECF pp. 103-15.)

Floyd appealed to the Nebraska Supreme Court, arguing that the state district court erred in denying his amended motion for postconviction relief without an evidentiary hearing on his ineffective assistance of counsel claims and in failing to appoint postconviction counsel. ([Filing No. 9-12](#); [Filing No. 9-14](#); [Filing No. 10-1 at CM/ECF pp. 1](#); [Filing No. 109-1 at CM/ECF pp. 5-6](#).) As articulated by the Nebraska Supreme Court, Floyd raised the following ineffective assistance of trial counsel claims: (1) failure to investigate other suspects; (2) failure to compare the bullets removed from Davis and the other victims; (3) failure to investigate whether Vickers could have identified Floyd from the bathroom window; (4) failure to request an independent forensic pathology expert and investigate the expert testimony; (5) failure to subpoena Officer Allen Wagner; (6) failure to subpoena Traeshawn Davis; (7) failure to subpoena Steven Lindsey; (8) failure to subpoena Carrissa Flanagain and Maurice Thomas; (9) failure to subpoena Dr. Darin Jackson; (10) failure to subpoena Becky Breyman, Coney Stephens, and Felicia Williams; (11) failure to subpoena Vickers and Theresa Gregg, the clinical manager of the emergency department at Creighton University Medical Center, to bring medical records relating to the alleged domestic abuse of Vickers by Floyd; (12) failure to exclude evidence of dismissed charges of assault with respect to the two other shooting victims; (13) failure to ask appropriate questions during voir dire; (14) failure to use peremptory strikes on jurors who were not removed for cause for seeing the newspaper article; (15) failure to request a pretrial jury instruction that the jurors avoid electronic media, such as twitter; (16) failure to use peremptory strikes on certain jurors for a variety of reasons; (17) failure to move to sequester the

jury; (18) failure to interview jurors after trial to determine whether or not there was jury misconduct during trial and deliberations; (19) failure to object to improper closing arguments; (20) failure to object to testimony by Vickers that she had seen Floyd with a gun; and (21) failure in advising Floyd to not testify. ([Filing No. 109-1 at CM/ECF pp. 9-29](#).)

Floyd also argued that appellate counsel was ineffective for failing to raise Fourteenth Amendment claims on direct appeal, specifically: lack of jurisdiction, use of false evidence and witnesses, the State's failure to disclose impeachment evidence (*Brady* material), failure to give proper notice of the nature and cause of accusations against Floyd, improper jury instructions, failure to prove guilt beyond a reasonable doubt, incorrect elements for first degree murder and manslaughter of an unborn child, presenting evidence designed to inflame the jury, the trial court erred in accepting the jury's guilty verdict when there was no proof of venue, trial court erred in overruling counsel's motion to remove for cause juror who had formed an opinion about Floyd's guilt, erroneous jury instructions, and insufficient evidence in the second amended information on counts I, II, and III. ([Filing No. 109-1 at CM/ECF pp. 29-31](#).)

In a written memorandum opinion filed May 23, 2013, the Nebraska Supreme Court affirmed the state district court's decision to dismiss Floyd's amended motion for postconviction relief without an evidentiary hearing. ([Filing No. 109-1](#).) The court found that each allegation of ineffective assistance of counsel was insufficient because either (1) Floyd failed to properly plead prejudice or (2) the record affirmatively demonstrated that Floyd was not prejudiced. (*Id*[. at CM/ECF pp. 8-9](#).) The court also found that the state district court did not err in failing to appoint counsel because Floyd's amended postconviction motion presented no justiciable issues. (*Id*[. at CM/ECF p. 31](#).) Floyd filed a motion for rehearing, which was denied as untimely on June 19, 2013. ([Filing No. 9-3 at CM/ECF p. 4](#).)

**D.  Habeas Petition**

Floyd filed his original Petition in this court on July 1, 2013 (Filing No. 1), an Amended Petition on July 7, 2017 (Filing No. 127), and Motion to Amend his Petition on October 6, 2017 (Filing No. 131). The "Petition" before the court consists of the Amended Petition (Filing No. 127) and Motion to Amend (Filing No. 131). In response to the Petition, Respondents filed an Answer (Filing No. 143), a Brief (Filing No. 144), and the relevant state court records (Filing Nos. 9, 10, 11, 12, 13, 31 & 109). Respondents argue that: (1) any habeas claims relating to Floyd's felon in possession of a firearm conviction are untimely and barred by the limitations period set forth in 28 U.S.C. § 2244(d); (2) the majority of Floyd's habeas claims relating to his murder and manslaughter convictions have been procedurally defaulted; and (3) any remaining claims that have not been procedurally defaulted have no substantive merit. (Filing No. 144 at CM/ECF p. 11.) Floyd filed a brief (Filing Nos. 186 & 187) in response to Respondents' Answer and supporting exhibits (Filing No. 192). Respondents filed a reply brief. (Filing No. 198.) This matter is fully submitted for disposition.

## III.  STATUTE OF LIMITATIONS

Respondents first argue that any claims relating to Floyd's conviction for felon in possession of a firearm are barred by the one-year statute of limitations set forth in 28 U.S.C. § 2244(d)(1).[5] Upon review, the court finds as follows.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposed a one-year statute of limitations on petitions for a writ of habeas corpus

---

[5] Respondents assert, and the court agrees, that Floyd's Petition was timely filed with respect to his first degree murder and manslaughter of an unborn child convictions.

filed pursuant to 28 U.S.C. § 2254. 28 U.S.C. § 2244(d)(1). 28 U.S.C. § 2244(d) states:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> >
> > (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> >
> > (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> >
> > (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

In the first direct appeal, the Nebraska Supreme Court reversed Floyd's convictions for first degree murder and manslaughter of an unborn child but affirmed his conviction and sentence for felon in possession of a firearm. (Filing No. 9-4.) On February 14, 2007, the Nebraska Supreme Court denied Floyd's motion for rehearing. (Filing No. 9-1 at CM/ECF p. 3.) Thus, absent a later triggering date under

13

28 U.S.C. § 2244(d)(1)(B)-(D), Floyd's conviction for felon in possession of a firearm became final on May 15, 2007, which is ninety days after the Nebraska Supreme Court denied Floyd's motion for rehearing. *See Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012) (holding that, for petitioners who do not pursue direct review all the way to the United States Supreme Court, a judgment becomes final "when the time for pursuing direct review in [the Supreme Court], or in state court, expires."); *King v. Hobbs*, 666 F.3d 1132, 1135 (8th Cir. 2012) ("If the Supreme Court has jurisdiction to review the direct appeal, the judgment becomes final ninety days after the conclusion of the prisoner's direct criminal appeals in the state system.") (citing Sup. Ct. R. 13.1). Accordingly, the one-year limitations period began to run from May 15, 2007. Floyd, however, did not file his original Petition in this court until July 1, 2013. (Filing No. 1.)

Floyd's filing of his motion for postconviction relief in state district court on June 21, 2010 did not toll the limitations period for the felon in possession of a firearm conviction because the limitations period for that conviction had already expired. *See Painter v. Iowa*, 247 F.3d 1255, 1256 (8th Cir. 2001) (holding "the time between the date that direct review of a conviction is completed and the date that an application for state post-conviction relief is filed counts against the one-year period"). Thus, absent an equitable exception, any claims related to Floyd's felon in possession of a firearm conviction or sentence are barred by the statute of limitations.[6]

---

[6] Floyd disputes that his Petition is untimely with respect to his conviction for felon in possession of a firearm, arguing that "[c]learly, the weapon conviction is connected to the murder charges." (Filing No. 186 at CM/ECF p. 4.) Although Floyd was convicted of all three charges in the first trial, on direct appeal, the felon in possession of a firearm conviction was affirmed while the murder and manslaughter convictions were vacated and remanded for retrial. Thus, the judgment of conviction for felon in possession of a firearm stood unreversed and unvacated after the first appeal. Accordingly, two limitations are at work—the limitations period for the murder and manslaughter convictions and the limitations period for the felon in

To the extent Floyd asserts that the statute of limitations for his felon in possession of a firearm conviction should be tolled because the failure to file a timely habeas petition challenging that conviction was a result of his counsel's incompetence, the court disagrees. (Filing No. 186 at CM/ECF p. 4 (stating that appellate counsel's failure to "correctly advise and represent petitioner constitute[s] cause for not appeal[ing] or exhausting [the weapon conviction]").) "A 'petitioner' is 'entitled to equitable tolling' only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). Equitable tolling is proper "only when extraordinary circumstances beyond a prisoner's control make it impossible to file a petition on time." *Runyan v. Burt*, 521 F.3d 942, 945 (8th Cir. 2008) (internal quotation omitted). As such, "equitable tolling is an exceedingly narrow window of relief." *Id.* (internal quotation omitted). Case law has been clear that attorney mistakes, such as the failure to file a timely petition, are "simply not sufficient to warrant equitable tolling." *Holland*, 560 U.S. at 656; *see also Maples v. Thomas*, 565 U.S. 281 (2012) ("Thus, when a petitioner's postconviction attorney misses a filing deadline, the petitioner is bound by the oversight and cannot rely on it to establish cause. We do not disturb that general rule."); *Lawrence v. Florida*, 549 U.S. 327, 336-37 (2007) ("Attorney miscalculation is simply not sufficient to warrant equitable tolling, particularly in the postconviction context where prisoners have no constitutional right to counsel."); *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990) ( "[T]he principles of equitable tolling . . . do not extend to what is at best a garden variety claim of excusable neglect."); *Beery v. Ault*, 312 F.3d 948, 951 (8th Cir. 2002) ( "Ineffective assistance of counsel generally does not warrant equitable tolling.").

---

possession of a firearm conviction. Stated differently, the limitations period for the murder and manslaughter convictions cannot be used to establish the limitations period for the felon in possession of a firearm conviction.

Furthermore, to the extent Floyd looks to *Martinez v. Ryan*, 566 U.S. 1 (2012), to support any argument that counsel's incompetence was an "extraordinary circumstance" that justifies equitable tolling, his reliance is misplaced. While *Martinez* changed the law regarding federal habeas review of procedurally defaulted claims, there has been no indication that the Supreme Court intended its procedural default analysis to apply to the statute of limitations, and courts have not extended the reasoning in *Martinez* to excuse untimely petitions. "Stated another way, the lack or ineffectiveness of counsel during postconviction collateral proceedings is not an 'extraordinary circumstance' that warrants equitable tolling of the statute of limitations in § 2254 habeas actions." *Alvarado v. Hansen*, No. 8:17CV283, 2018 WL 4006768, at *8 (D. Neb. Aug. 22, 2018), *reconsideration denied*, No. 8:17CV283, 2018 WL 4401732 (D. Neb. Sept. 14, 2018), *certificate of appealability denied*, No. 18-3108, 2019 WL 1467007 (8th Cir. Jan. 22, 2019); *see also Lombardo v. United States*, 860 F.3d 547, 555-61 (7th Cir. 2017) (court declined to recognize *Martinez*'s framework as a means of establishing extraordinary circumstances for the purposes of equitable tolling); *Arthur v. Thomas*, 739 F.3d 611, 631 (11th Cir. 2014) (holding that the *Martinez* rule does not apply to the one-year limitations period in § 2254 cases or any potential tolling of that period); *Parkhurst v. Wilson*, 525 Fed. App'x 736, 738 (10th Cir. 2013) (*Martinez* does not provide a basis for equitable tolling); *Smith v. Hobbs*, 2014 WL 2718698, at *2 (E.D. Ark. May 15, 2014) (*Martinez* holding is not an extraordinary circumstance that would justify equitable tolling; "[w]hether a claim is procedurally defaulted is a completely distinct question from whether it is barred by the . . . statute of limitations").

Thus, Floyd has failed to demonstrate that an "extraordinary circumstance" prevented timely filing of a habeas petition related to his conviction for felon in possession of a firearm. Floyd has also failed to establish, or even argue, that he was pursuing his rights diligently with respect to that conviction. Because Floyd provides no basis for extending the limitations period for his felon in possession of a firearm conviction, he is not entitled to any equitable tolling with respect to that conviction.

Accordingly, the court will not address any claims in the Petition that are related to Floyd's felon in possession of a firearm conviction.

The court will now turn to the claims in the Petition that relate to Floyd's convictions for first degree murder and manslaughter of an unborn child.

## IV.  OVERVIEW OF APPLICABLE LAW

Various strands of federal habeas law intertwine in this case. They are (1) exhaustion and procedural default; (2) the deference that is owed to the state courts when a federal court reviews the factual or legal conclusions set forth in an opinion of a state court; and (3) the standard for evaluating a claim of ineffective assistance of counsel. The court elaborates upon those concepts next so that it may apply them later in a summary fashion as it reviews Floyd's claims.

### A.  Exhaustion and Procedural Default

As set forth in 28 U.S.C. § 2254:

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

(A) the applicant has exhausted the remedies available in the courts of the State; or

(B)(i) there is an absence of available State corrective process; or

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The United States Supreme Court has explained the habeas exhaustion requirement as follows:

> Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

*O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

A state prisoner must therefore present the substance of each federal constitutional claim to the state courts before seeking federal habeas corpus relief. In Nebraska, "one complete round" ordinarily means that each § 2254 claim must have been presented in an appeal to the Nebraska Court of Appeals, and then in a petition for further review to the Nebraska Supreme Court if the Court of Appeals rules against the petitioner. *See Akins v. Kenney*, 410 F.3d 451, 454-55 (8th Cir. 2005).

"In order to fairly present a federal claim to the state courts, the petitioner must have referred to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue in a claim before the state courts." *Carney v. Fabian*, 487 F.3d 1094, 1096 (8th Cir. 2007) (internal citation and quotation omitted). Although the language need not be identical, "[p]resenting a claim that is merely similar to the federal habeas claim is not sufficient to satisfy the fairly presented requirement." *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999). In contrast, "[a] claim has been fairly presented when a petitioner has properly raised the 'same factual grounds and legal theories' in the state courts which he is attempting to raise in his federal habeas petition." *Wemark v. Iowa*, 322 F.3d 1018, 1021 (8th Cir. 2003) (citation omitted).

Where "no state court remedy is available for the unexhausted claim—that is, if resort to the state courts would be futile—then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default.'" *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005) (quoting *Gray v. Netherland*, 518 U.S. 152, 162 (1996)).

To be precise, a federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Also, a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims on the merits notwithstanding the existence of a procedural bar to relief. *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). To invoke the actual innocence exception, a petitioner "must show that in light of all the evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Jennings v. United States*, 696 F.3d 759, 764-65 (8th Cir. 2012) (quoting *Schlup v. Delo*, 513 U.S. 298, 327, (1995)). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Id.* (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

## B.  Nebraska Law Relevant to Procedural Default

Under Nebraska law, you don't get two bites of the postconviction apple; that is, "[a]n appellate court will not entertain a successive motion for postconviction relief unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time the movant filed the prior motion." *State v. Ortiz*, 670 N.W.2d 788, 792 (Neb. 2003). Additionally, "[a] motion for postconviction

relief cannot be used to secure review of issues which were or could have been litigated on direct appeal." *Hall v. State*, 646 N.W.2d 572, 579 (Neb. 2002). *See also State v. Thorpe*, 858 N.W.2d 880, 887 (Neb. 2015) ("A motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal, no matter how those issues may be phrased or rephrased.")

Moreover, a person seeking post-conviction relief must present his or her claim to the district court or the Nebraska appellate courts will not consider the claim on appeal. *State v. Deckard*, 722 N.W.2d 55, 63 (Neb. 2006) (denying postconviction relief in a murder case and stating: "An appellate court will not consider as an assignment of error a question not presented to the district court for disposition through a defendant's motion for postconviction relief.") Similarly, on appeal, the appealing party must both assign the specific error and specifically argue that error in the brief. Otherwise the claim is defaulted under Nebraska law. *State v. Henry*, 875 N.W.2d 374, 407 (Neb. 2016) (stating an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court).

Additionally, Nebraska has a statute of limitations for bringing postconviction actions that is similar to federal law. It reads:

> (4) A one-year period of limitation shall apply to the filing of a verified motion for postconviction relief. The one-year limitation period shall run from the later of:
>
> > (a) The date the judgment of conviction became final by the conclusion of a direct appeal or the expiration of the time for filing a direct appeal;
> >
> > (b) The date on which the factual predicate of the constitutional claim or claims alleged could have been discovered through the exercise of due diligence;

(c) The date on which an impediment created by state action, in violation of the Constitution of the United States or the Constitution of Nebraska or any law of this state, is removed, if the prisoner was prevented from filing a verified motion by such state action;

(d) The date on which a constitutional claim asserted was initially recognized by the Supreme Court of the United States or the Nebraska Supreme Court, if the newly recognized right has been made applicable retroactively to cases on postconviction collateral review; or

(e) August 27, 2011.

Neb. Rev. Stat. § 29-3001(4) (West).

## C. Deferential Standard Under 28 U.S.C. § 2254(d)

When a state court has adjudicated a habeas petitioner's claim on the merits, there is a very limited and extremely deferential standard of review both as to the law and the facts. *See* 28 U.S.C. § 2254(d). Section 2254(d)(1) states that a federal court may grant a writ of habeas corpus if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). As explained by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362 (2000), a state court acts contrary to clearly established federal law if it applies a legal rule that contradicts the Supreme Court's prior holdings or if it reaches a different result from one of that Court's cases despite confronting indistinguishable facts. *Id.* at 405-06. Further, "it is not enough for [the court] to conclude that, in [its] independent judgment, [it] would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable." *Rousan v. Roper*, 436 F.3d 951, 956 (8th Cir. 2006).

With regard to the deference owed to factual findings of a state court's decision, section 2254(d)(2) states that a federal court may grant a writ of habeas corpus if a state court proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Additionally, a federal court must presume that a factual determination made by the state court is correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

As the Supreme Court noted, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The deference due state court decisions "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Id.*

However, this high degree of deference only applies where a claim has been adjudicated on the merits by the state court. *See Brown v. Luebbers*, 371 F.3d 458, 460 (8th Cir. 2004) ("[A]s the language of the statute makes clear, there is a condition precedent that must be satisfied before we can apply the deferential AEDPA [Antiterrorism and Effective Death Penalty Act] standard to [the petitioner's] claim. The claim must have been 'adjudicated on the merits' in state court.").

The Eighth Circuit clarified what it means for a claim to be adjudicated on the merits, finding that:

> AEDPA's requirement that a petitioner's claim be adjudicated on the merits by a state court is not an entitlement to a well-articulated or even a correct decision by a state court. Accordingly, the postconviction trial court's discussion of counsel's performance—combined with its express determination that the ineffective-assistance claim as a whole

lacked merit—plainly suffices as an adjudication on the merits under AEDPA.

*Worthington v. Roper*, 631 F.3d 487, 496-97 (8th Cir. 2011) (internal quotation marks and citations omitted).

The court also determined that a federal court reviewing a habeas claim under AEDPA must "look through" the state court opinions and "apply AEDPA review to the 'last reasoned decision' of the state courts." *Id.* at 497. A district court should do "so regardless of whether the affirmance was reasoned as to some issues or was a summary denial of all claims." *Id.*

## D.  The Especially Deferential *Strickland* Standard

When a petitioner asserts an ineffective assistance of counsel claim, the two-pronged standard of *Strickland v. Washington*, 466 U.S. 668 (1984), must be applied. The standard is very hard for offenders to satisfy.

*Strickland* requires that the petitioner demonstrate both that his counsel's performance was deficient, and that such deficient performance prejudiced the petitioner's defense. *Id.* at 687. The first prong of the *Strickland* test requires that the petitioner demonstrate that his attorney failed to provide reasonably effective assistance. *Id.* at 687-88. In conducting such a review, the courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

The second prong requires the petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Further, as set forth in *Strickland*, counsel's "strategic choices made after thorough investigation of law and facts relevant to

plausible options are virtually unchallengeable" in a later habeas corpus action. *Id.* at 690.

Additionally, the Supreme Court has emphasized that the deference due the state courts applies with special vigor to decisions involving ineffective assistance of counsel claims. *Knowles v. Mirzayance*, 556 U.S. 111 (2009). In *Knowles*, the Justices stressed that under the *Strickland* standard, the state courts have a great deal of "latitude" and "leeway," which presents a "substantially higher threshold" for a federal habeas petitioner to overcome. As stated in *Knowles*:

> The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold. And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Id.* at 123 (internal quotation marks and citations omitted).

*Strickland* applies equally to appellate counsel, and appellate counsel is entitled to the "benefit of the doubt." *Woods v. Etherton*, 136 S. Ct. 1149, 1153 (2016) (a "fairminded jurist" could have concluded that repetition of anonymous tip in state-court cocaine-possession trial did not establish that the uncontested facts it conveyed were submitted for their truth, in violation of the Confrontation Clause, or that petitioner was prejudiced by its admission into evidence, precluding federal habeas relief under AEDPA; petitioner could not establish that petitioner's appellate counsel was ineffective, as appellate counsel was entitled to the "benefit of the doubt").

# V. DISCUSSION

## A. Claim One

Claim One consists of thirty-nine subparts alleging ineffective assistance of trial counsel. As a general matter, the court observes that the state district court and the Nebraska Supreme Court properly set forth the *Strickland* standards before addressing Floyd's ineffective assistance of counsel claims. (Filing No. 10-6 at CM/ECF at pp. 102-03; Filing No. 109-1 at CM/ECF pp. 6-8.)

### 1. Failure to Investigate

Floyd raises multiple failure to investigate claims. (*See, e.g.*, Claim One, Subparts (1),[7] (4), (6), (7), (8), (11), (19), (25), and (28).) As best the court can tell, the majority of these claims correspond to Floyd's state court postconviction arguments that trial counsel failed to properly investigate certain facts and witnesses, which would have established that Vickers did not positively identify, and could not have positively identified, Floyd as the shooter and that a person other than Floyd had committed the crimes.

In its order affirming the state district court's denial of postconviction relief, the Nebraska Supreme Court addressed the failure to investigate claims as follows:

FAILURE TO PROPERLY INVESTIGATE FACTS AND WITNESSES

First, Floyd contends that his trial counsel failed to properly investigate certain facts and witnesses. He alleges he was prejudiced in two ways: (1) certain facts and witnesses would have established that Vickers did not and could not have positively identified Floyd as the shooter, and

_____

[7] This claim is also discussed below in the context of a failure to subpoena claim.

(2) certain discoverable evidence would have led the jury to believe that a person other than Floyd had committed the crimes.

A defense attorney has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Counsel is not expected to pursue avenues of investigation unless there is some basis to believe it might reveal some evidence of information which would assist in the defense. Because the district court did not hold an evidentiary hearing, we cannot, from the record, determine if trial counsel did in fact investigate these allegations or if his decision to not investigate was reasonable. We can, however, address whether Floyd was prejudiced by these alleged failures to investigate.

To establish prejudice under an ineffective assistance claim, a defendant must specify the nature of the exculpatory evidence that he contends his counsel failed to discover. This evidence must overcome the compelling evidence that substantiates a defendant's guilt as found in the record. We will now address each failure to investigate claim.

(a)     Other Suspects

Floyd argues that his trial counsel failed to properly investigate the prior instances of Davis being a victim of assault, vandalism, and domestic abuse from her ex-boyfriend, indicating that the ex-boyfriend could have been the perpetrator. Floyd also argues that his trial counsel should have investigated witnesses who would have testified that three men were seeking retribution against Davis' incarcerated brother. He alleges that this would have strengthened his theory that Davis was the targeted victim and weakened the State's theory that Davis was the unintended victim of Floyd's attempt to shoot Vickers.

Floyd fails to properly plead prejudice on these purported investigatory failures. He repeatedly states that the evidence would have refuted the prosecution's theory of intent and that investigation "may" have discovered the true suspect. But Floyd fails to indicate what exculpatory evidence would have been discovered by his trial counsel. Rather, he is

essentially arguing that his trial counsel should have gone on a larger fishing expedition for evidence of other pretrial suspects.

Additionally, the record demonstrates that the jury was presented with evidence and argument that someone other than Floyd had the motive and intent to commit these crimes. Defense counsel adduced evidence suggesting that there existed other suspects. In his closing argument, Floyd's trial counsel argues that "it's not absurd to believe that the shooter may have hit the target for whom he or she was aiming."

The jury was thus aware of Floyd's theory and there is no allegation explaining how further investigation would have discovered exculpatory evidence. Therefore, his conclusory allegations of ineffective assistance of counsel in this regard are insufficient on their face to afford a basis for postconviction relief.

### (b) The Bullets

Floyd argues that counsel was ineffective for failing to compare the bullets removed from Davis and the other victims. He alleges that it may have established multiple perpetrators. This apparently would add further credence to his theory that a gang of three men, seeking retribution, committed the crimes.

Floyd fails to sufficiently plead what exculpatory evidence that his suggested investigation would have produced. He described no evidence that would have indicated there were multiple guns involved. Even if we were to assume there were different bullets, he does not explain how such evidence is exculpatory. Such evidence does not prove that Floyd was not the shooter—either with multiple guns or with accomplices. Floyd has failed to properly plead prejudice in the alleged failure to investigate the bullets.

### (c) Vickers' Ability to See out the Bathroom Window

Floyd argues that counsel failed to investigate whether Vickers could have identified Floyd from the bathroom window. He argues that counsel should have investigated the angle of bullets shot, the gun

powder residue, and the expansion of the fired bullet to determine where the shooter was standing. Floyd alleges that this may have proven that Vickers could not have physically been able to see the shooter and could not have positively identified Floyd as the shooter.

The record affirmatively establishes that Floyd was not prejudiced by this alleged failure to investigate because any "discovered" evidence would have been cumulative to the evidence produced at trial. Trial counsel during the cross examination of Vickers spent a lot of time questioning her ability to see out the window. He questioned her on vehicles parked in the driveway which may have blocked her view. He elicited that pictures taken during the crime investigation show the mini-blinds on the bathroom window were closed.

During a video deposition played for the jury by defense counsel, Wayne Melcher, an Omaha Police Officer involved in the investigation, testified that he and another detective could not see out the window as described by Vickers. Specifically, with each looking out the window in broad daylight, they could not see the officer standing in the spot Vickers testified that Floyd was standing.

Therefore, it was well established at trial that Vickers may not have been able to see the shooter. The discoverable evidence suggested by Floyd—but not specifically described in the motion—would not have changed the outcome. It would have merely reiterated already established evidence. This claim has no merit.

(d)  Forensic Pathology

Floyd argues that "[t]rial counsel knew that the State's forensic pathology expert prepared a[n] autopsy report, but did not request for independent forensic pathology expert to reput [sic] the State's forensic pathology expert testimony." Floyd also complains that trial counsel did not investigate the expert testimony. Floyd does not allege how he was prejudiced and does not specify in any manner what type of exculpatory evidence would have been discovered. Floyd has failed to

properly allege any prejudice for the alleged failure to hire an independent forensic pathology expert.

(Filing No. 109-1 at CM/ECF pp. 9-14 (footnotes omitted).)

For those failure to investigate subparts of Claim One that correspond to the postconviction claims discussed above, Floyd has not established that the Nebraska Supreme Court's denial of relief on his failure to investigate claims resulted in an unreasonable application of law or was based on an unreasonable determination of the facts. Floyd does not allege that the Nebraska Supreme Court erred in its findings that: (1) the jury was presented with evidence and argument that someone other than Floyd had the motive and intent to commit these crimes, and thus, trial counsel adduced evidence suggesting that there existed other suspects; and (2) it was well established at trial that Vickers may not have been able to see the shooter. The Nebraska Supreme Court disposed of these arguments by concluding that Floyd had not been prejudiced by any alleged deficiency in his trial counsel's failure to investigate certain facts and witnesses; that is to say, the court directly applied the second prong of the United States Supreme Court's well-established standard in *Strickland*, 466 U.S. at 687. To establish prejudice under *Strickland*, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Floyd cannot establish prejudice where the evidence he insists would have been discovered had counsel adequately investigated is merely cumulative. *See Wong v. Belmontes*, 558 U.S. 15, 22-23 (2009). Because the Nebraska Supreme Court's finding of no prejudice is reasonable and is consistent with the *Strickland* test, Floyd is not entitled to any federal habeas relief on his failure to investigate claims set forth in Claim One.

For any failure to investigate subparts of Claim One that were raised in the postconviction proceedings but do not correspond to any of the claims specifically addressed by the Nebraska Supreme Court above, the court finds that Floyd has

failed to establish that he is entitled to habeas relief. Floyd has failed to explain how any further investigations would have changed the outcome of the trial. The jury was aware of Floyd's alternative suspect theory and that Vickers may not have been able to see the shooter. Any additional evidence attacking Vickers' credibility or indicating alternative suspects would have been cumulative and would not have changed the outcome. *See Wong*, 558 U.S. at 22-23. Notably, the state district court[8] summarily rejected all the failure to investigate claims for similar reasons:

> Without going into each allegation, the Defendant here simply relies on conclusory statements, recitations of the record or portions of police reports. Defendant fails to set forth what exculpatory evidence would have been discovered that could have changed the outcome of the trial or that he told counsel about these avenues of investigation. These allegations are insufficient to warrant an evidentiary hearing. Furthermore, the record refutes the majority of these allegations when considering the cross-examination by defense counsel and the evidence produced by the State.

(Filing No. 10-6 at CM/ECF p. 106.)[9] Floyd has failed to rebut, by clear and convincing evidence, the Nebraska state district court's findings of fact on this issue,

---

[8] The state district court's findings of fact and conclusions of law are entitled to deference under the statutory standard of review that applies to factual and legal conclusions reached by the state courts. *See* Federal Habeas Manual § 3:21 ("The deference afforded by § 2254(d)(1) is not limited to adjudications by the state's highest court, but includes adjudications by state intermediate appellate and trial courts." (citing cases)); Federal Habeas Manual § 3:25 ("And where successive state court decisions decided separate issues, such as the separate prongs of a *Strickland* inquiry, each individual state court decision constitutes a merits adjudication entitled to § 2254(d) deference." (citing cases)).

[9] The state district court recited a portion of the opinion in *State v. Soukharith*, 260 Neb. 478, 618 N.W.2d 409 (2000), where the defendant similarly made several claims regarding his counsel's failure to investigate several issues, which were all rejected by the Nebraska Supreme Court. (Filing No. 10-6 at CM/ECF pp. 104-05.)

nor did he make any effort to do so. The court finds that the Nebraska state district court reasonably applied *Strickland* in concluding that Floyd had not demonstrated prejudice from trial counsel's alleged failure to investigate certain facts and witnesses.

## 2. Failure to Subpoena Witnesses

Floyd also raises several claims that trial counsel was ineffective for failing to interview, subpoena, or call certain witnesses to testify (*see*, *e.g.*, Claim One, Subparts (1), (2), (3), (5), and (20)). The court will set forth the state court decisions for each subpart separately and then address the merits of all the subparts collectively.

### i. Claim One, Subpart (1)

In Claim One, Subpart (1), Floyd contends that trial counsel was ineffective for failing to investigate Carrissa Flanagan, Maurice Thomas, and men hired to retaliate against Maurice Davis and his family as possible suspects and for failing to introduce that evidence at trial. (Filing No. 127 at CM/ECF pp. 17, 18-19, 33, 34-35.) In addition to stating a failure to investigate claim, the court construes this claim as corresponding to Floyd's postconviction claim that trial counsel was ineffective for failing to subpoena Carrissa Flanagan and Maurice Thomas. Both the state district court and the Nebraska Supreme Court rejected this claim. The state district court wrote:

---

To avoid adding to this lengthy Memorandum and Order, the court has omitted this recitation.

Carrissa Flanagain[10] and Maurice Thomas – Defendant claims counsel was ineffective in failing to subpoena these two individuals as witnesses, because they were the two main suspects initially after the murder. First, Defendant fails to state what either of these witnesses would testify about if called to the stand. Also, the record refutes either witness would have changed the outcome of the trial since they did not match the description of the shooter. (BOE 1370:1-1371:22). Additionally, counsel cross-examined Detective Perna, Shantelle Vickers, and Shaquille Davis about the information as to why Flanagain and Thomas were initially suspects in this case.

(Filing No. 10-6 at CM/ECF p. 108.) The Nebraska Supreme Court similarly ruled:

Floyd alleges that Carrissa Flanagain and Maurice Thomas should have been called to testify because both were initial suspects. Thomas, the "ex-boyfriend," was the father of Davis' children and Carrissa was his new girlfriend. Floyd believes that if they had been called as witnesses that they may have incriminated themselves by establishing that they had a motive to kill Davis.

Floyd fails to specify what exculpatory testimony would have been elicited from these witnesses during trial. Floyd does not even specify what questions would have been asked during the direct examination of these witnesses. It seems improbable that either would have incriminated themselves. Further, testimony about why they were initial suspects during the investigation was explored during the cross examinations of Detective Christopher Perna, Vickers, and Shaquille Davis. Therefore, Floyd has failed to plead sufficient facts that demonstrate the outcome of the trial would have been different if these witnesses had been called.

(Filing No. 109-1 at CM/ECF pp. 16-17.)

---

[10] The Nebraska state courts spelled "Flanagan" as "Flanagain." Throughout this Memorandum and Order the court will use "Flanagan."

### ii.  Claim One, Subpart (2)

In Claim One, Subpart (2), Floyd argues that trial counsel was ineffective because he failed to interview Becky Breyman, Felicia Williams, and Coney Stephens. ([Filing No. 127 at CM/ECF p. 18.](#)) He asserts that these witnesses would have revealed information that Destiny Davis "was the victim of numerous assaults and vandalism" and established "a pattern of domestic violence" involving Davis, including a "large, knock-down, drag-out fight two weeks prior to the shooting." (*[Id.](#)*) According to Floyd, this information would have revealed alternative suspects, including Carrissa Flanagan and Maurice Thomas. (*[Id.](#)*)

Respondents submit that this is essentially the same claim that Floyd raised in his postconviction appeal; namely, that Breyman, Stephens, and Williams should have been called to testify to arguing heard in Davis' apartment prior to the murder because it strengthened his theory that someone else killed Davis. ([Filing No. 144 at CM/ECF p. 21](#) (citing [Filing No. 109-1 at CM/ECF p. 18](#)).) Both the state district court and the Nebraska Supreme Court rejected this claim. The state district court found as follows:

> Becky Breyman, Coney Stephens, and Felicia Williams – Defendant asserts counsel was ineffective in not calling these witnesses to testify that they had heard arguments in the victim's apartment prior to the murder. Defendant does not state facts to establish when these arguments took place, who was arguing or what was being said in the arguments, which is insufficient to warrant an evidentiary hearing. *See Davlin*, *supra* (finding insufficient facts for an evidentiary hearing when the defendant failed to state what exculpatory testimony the witnesses would have provided had counsel called them to the stand).
>
> The majority of allegations surrounding these witnesses are that counsel was ineffective in failing to subpoena them to testify about an inability to see out the bathroom window or potential suspects. In considering these allegations as a whole, the Court should consider

*Harrington v. Richter*, 131 S. Ct. 770 (2011), wherein the defendant argued in a postconviction that his counsel was ineffective in failing to consult with blood experts to create a trial strategy and offer their testimony in support of his defense. In rejecting the claim, the court noted that counsel is "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Id.* The court further explained that pursuing certain investigations could often work against a defendant, so a court should consider that an "attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense" and that to "support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to prove a certainty that exonerates." *Id.* A review of the record supports a finding that counsel effectively created suspicion through cross-examination and argument and that bringing some of the witnesses that Defendant now requests could have limited that argument or actually assisted in further establishing Defendant's guilt.

(Filing No. 10-6 at CM/ECF pp. 109-10.)

In its order affirming the state district court's denial of postconviction relief, the Nebraska Supreme Court considered and rejected this argument. The court wrote:

Having three witnesses testify to hearing arguments coming from Davis' apartment would not have changed the outcome of this case. As already established, the jury was aware that there were other possible suspects. Floyd has once again failed to demonstrate how this testimony would have revealed exculpatory evidence that would have changed the outcome of this case.

(Filing No. 109-1 at CM/ECF p. 18.)

### iii. Claim One, Subpart (3)

In Claim One, Subpart (3), Floyd argues that trial counsel was ineffective because he failed to subpoena Traeshawn Davis to testify at trial, or alternatively, introduce his prior trial testimony. (Filing No. 127 at CM/ECF pp. 20, 33.)

Both the state district court and the Nebraska Supreme Court considered Floyd's claim that trial counsel was ineffective for failing to subpoena Traeshawn to testify at trial. The state district court rejected the claim, finding: "The record reflects that counsel acted reasonable [sic] and attempted to subpoena this witness, but was unsuccessful. (BOE 1524:6-1529:24). Thus, the record refutes counsel was ineffective. *See Davlin*, 277 Neb. at 983 (finding counsel not ineffective when subpoenas were issued, but not successfully served [on] the witness)." (Filing No. 10-6 at CM/ECF pp. 107-08.) The Nebraska Supreme Court also rejected the claim. The court wrote:

> Floyd alleges that Traeshawn Davis, who was seven when he was shot at the same time Destiny Davis was shot, should have been called as a witness at the second trial. According to Floyd, Traeshawn would have testified to there being three masked men outside with guns, as Traeshawn stated in the police report. Floyd believes that this evidence would have substantiated his defense theory. We disagree for two reasons. First, the record indicates that trial counsel was not ineffective because trial counsel did in fact attempt to subpoena this witness. Second, the record affirmatively establishes that Floyd was not prejudiced.
>
> In *State v. Davlin*, we held that failing to get a witness to testify was not deficient performance if the trial counsel acted reasonably in his attempt to subpoena a witness. The record demonstrates that trial counsel acted reasonably in getting Traeshawn to testify. At trial, trial counsel called Bob Fields to testify. Fields was an investigator for the Public Defender's Office. He testified that he worked with the prosecutor's office to find Traeshawn and could not do so. This included an attempt to track him down at his last known address.

Additionally, there was no prejudice in Traeshawn's failure to testify because there is no reason to believe Traeshawn would have testified that he saw three masked men. In fact, during the 2005 trial, Traeshawn testified that he did not see three masked men and denied ever telling the officers that he did see three men. Therefore, Floyd was not prejudiced by Traeshawn not testifying.

(Filing No. 109-1 at CM/ECF pp. 15-16 (footnotes omitted).)[11]

### iv.  Claim One, Subpart (5)

In Claim One, Subpart (5), Floyd argues that trial counsel was ineffective because he failed to interview Steven Lindsey (Shantelle Vickers' father) and subpoena him to testify at trial. (Filing No. 127 at CM/ECF pp. 22, 33.) Floyd asserts that Lindsey would have testified that Vickers could not have seen the shooter out of the window. (*Id.*) Both the state district court and the Nebraska Court of Appeals considered this issue. The state district court ruled:

Defendant asserts Lindsey would have been called to testify that Shantelle Vickers could not have seen the shooter out of the window. First, such testimony would be speculative, as Lindsey was not in the bathroom during the shooting and thus, inadmissible. Further, counsel cross-examined Shantelle Vickers and officers at great length to cast

---

[11] The court notes that, although the Nebraska state courts did not explicitly address Floyd's argument that trial counsel failed to introduce Traeshawn's prior trial testimony, the Nebraska Supreme Court found that, during the first trial, Traeshawn testified that he did not see three masked men and denied ever telling the officers that he did see three men. As such, it is unclear how Traeshawn's prior trial testimony would have assisted Floyd's defense and changed the outcome of this case.

doubt on whether someone could see out of the bathroom window at night.

([Filing No. 106 at CM/ECF p. 108](#).) The Nebraska Supreme Court also rejected the claim as follows:

> Floyd believes that Steven Lindsey should have been called to testify that he believed that Vickers could not have seen the shooter from the bathroom window. As already discussed, this testimony would be speculative and would be cumulative to the evidence presented at trial. Floyd cannot demonstrate that this alleged failure prejudiced him.

([Filing No. 109-1 at CM/ECF p. 16](#).)

### v. Claim One, Subpart (20)

In Claim One, Subpart (20), Floyd argues that trial counsel was ineffective because he failed to subpoena Officer Allen Wagner to testify at trial. (*Id.* at CM/ECF p. 36.) Floyd alleges that Officer Wagner "would have testified that Shantelle Vickers 'never saw Floyd at the scene.'" (*Id.* at CM/ECF pp. 36-37.) Both the state district court and the Nebraska Supreme Court adjudicated and rejected this argument on the merits and did so under the prejudice-prong *Strickland* standard. The state district court determined that the testimony Floyd "asserts would be adduced through this witness would be cumulative, as it came in through other witnesses such as another first responding officer, Jeff Warnock. (BOE 780:20-815:8). *Wong v. Belmontes*, 130 S. Ct. 383 (2009) (noting a defendant does not suffer prejudice when the evidence is merely cumulative)." ([Filing No. 10-6 at CM/ECF p. 107](#).) The Nebraska Supreme Court similarly wrote:

> Floyd contends that Officer Allen Wagner should have been called as a witness. Floyd argues that in the first trial Wagner testified that Vickers told him that she never saw Floyd at the scene. Floyd asserts that defense counsel should have called Wagner again at Floyd's second

trial. According to Floyd, defense counsel's failure to do so prejudiced his defense.

This evidence would have been cumulative with the testimony provided by Officer Jeff Warnock. Warnock admitted that Vickers never told him that she had seen the shooter. Additionally, Melcher testified that it was physically impossible to see the shooter, as described by Vickers, from the window. Therefore, Floyd cannot establish that he was prejudiced by the exclusion of this evidence.

(Filing No. 109-1 at CM/ECF pp. 14-15.)

### vi. Analysis

Floyd did not rebut, by clear and convincing evidence, the Nebraska state courts' findings that: (1) the jury was aware of the alternative suspect theory; and (2) the jury was presented with evidence that cast doubt on Vickers' ability to see the shooter out of the bathroom window. Floyd has failed to specify what exculpatory testimony any of these witnesses would have provided or that their testimony would have changed the outcome of the trial. Indeed, the testimony that Floyd alleges these witnesses would have provided would have been cumulative of the alternative suspect evidence and/or the evidence calling into doubt Vickers' ability to see the shooter. *See Wong*, 558 U.S. at 22-23. The court finds that the Nebraska state courts reasonably applied *Strickland* in concluding that Floyd had not demonstrated prejudice from trial counsel's failure to call these witnesses at trial. Thus, Floyd has failed to establish that the Nebraska state courts' decisions on these claims were contrary to, or involved an unreasonable application of, clearly established federal law, or involved an unreasonable determination of the facts in light of the evidence. Claim One, Subparts (1), (2), (3), (5), and (20) have no merit, and a grant of a writ of habeas corpus is not warranted on these issues.

### 3.  Claim One, Subparts (14) and (15)

The court construes these claims as pertaining to the fair and impartial jury claims that Floyd raised in the postconviction proceedings. The state district court rejected these claims as follows:

> Defendant asserts counsel was ineffective in failing to impanel a fair and impartial jury. In doing so, Defendant argues several of the jurors should have been struck for cause for numerous different reasons. In the direct appeal from this very case, the Nebraska Supreme court noted Neb. Rev. Stat. § 29-2006 in upholding this Court's decision not to strike potential jurors for exposure to a newspaper article, because that sections [sic] requires a showing that a juror has "expressed an opinion as to the guilt or innocence of the accused." Again, as in the direct appeal, Defendant has not alleged and there is no evidence to suggest that any of the jurors cited by Defendant had ever formed an opinion about his guilt or had made any statements that would qualify them to be struck for cause pursuant to § 29-2006. Thus, any motion to strike would have been overruled and counsel was not deficient. *See State v. McLeod*, 274 Neb. 566, 741 N.W.2d 664 (2007) ("Defense counsel is not ineffective for failing to raise an argument that has no merit[.]").

(Filing No. 10-6 at CM/ECF pp. 110-11.)

The state district court further held that "[a]ll other allegations regarding the jury are simply speculation and allegation that do not warrant any further discussion other than to request they be dismissed without an evidentiary hearing." (*Id.* at CM/ECF p. 111 n.1.)

On appeal, the Nebraska Supreme Court also rejected the claims. The court wrote:

> Floyd argues that his counsel was ineffective for failing to impanel a fair and impartial jury in four ways. First, Floyd argues that trial counsel

failed to ask appropriate questions during voir dire. Second, Floyd alleges that trial counsel was ineffective for failing to use peremptory strikes on jurors who were not removed for cause for seeing the newspaper article. Third, Floyd alleges that trial counsel was ineffective for failing to request a pretrial jury instruction that the jurors avoid electronic media, such as twitter. Fourth, he alleges that peremptory strikes should have been used on certain jurors for a variety of reasons. We find that the record clearly demonstrates that none of these errors prejudiced Floyd.

First, Floyd argues that counsel should have asked more questions about the potential jurors' stances on abortion because this case involved the death of an unborn child. We reject this argument. Floyd does not establish why trial counsel's decision to not ask about abortion is deficient. Further, Floyd provides no allegation that any of the jurors' beliefs on abortion resulted in prejudice during his trial.

Second, Floyd argues that peremptory strikes should have been used on the jurors who saw the newspaper article but were not struck for cause. On the direct appeal, we held that "Floyd has failed to meet his burden of showing that his right to a fair trial was prejudiced by the alleged misconduct [allowing the two jurors who had been exposed to the newspaper article to sit on the jury]." Likewise, we now find that Floyd was not prejudiced by his trial counsel's failure to remove these jurors with a peremptory strike.

Third, Floyd argues that trial counsel did not specifically ask whether jurors were exposed to tweets, blogs, or internet searches and failed to request the court to add this language in the admonition. Floyd fails to allege that a juror was exposed to outside information on his case via these electronic means. Further, he fails to allege which juror was unfair and biased because of exposure to electronic media. Therefore, Floyd failed his burden to plead prejudice.

Fourth, Floyd outlines a variety of reasons why jurors should have been struck for cause or been removed by a peremptory strike. We will

explain each of Floyd's arguments against particular jurors and address them all collectively.

Floyd argues that a peremptory strike should have been used on juror L.S. for four different reasons. First, L.S. had been exposed to media coverage on the murder of Davis prior to the trial. Second, L.S. had a good friend in the Omaha Police Department. Third, L.S. had previously sat on a jury for an unrelated murder trial. And fourth, L.S. was used as a witness in an unrelated animal abuse case.

Floyd argues that juror R.C. should have been stricken for cause or peremptorily struck because she had a friend killed by domestic violence. Floyd alleges she was overly emotional. Likewise, he argues that jurors B.H. and N.S. should have been peremptorily struck because of their experiences with domestic violence.

Floyd also alleges that jurors R.J. #15, T.T., R.J. #30, and D.W. should have been peremptorily struck because of varying relationships with Omaha police officers. Likewise, he argues that jurors A.M. and N.S. should have been peremptorily struck because of contacts with non-Omaha police officers. Floyd argues that juror T.T. should have been struck because she was pregnant. Finally, he argues juror D.B. should have been struck because he expressed that if a mother is shot and killed, there should be "automatic guilt" for the murder of the unborn child.

Although Floyd has presented reasons why it may have been a strategic decision to strike the above jurors, he fails to provide any real evidence that these jurors were unfairly biased against him. He does not cite any case law that would require any of these jurors to be removed from the jury. He does not allege extrinsic evidence that any of these alleged biases resulted in the juror not being fair or impartial. In fact, our review of the record indicates that each of these jurors stated that they could set aside their biases for purposes of this trial. Absent more evidence, Floyd has failed to properly plead prejudice.

(Filing No. 109-1 at CM/ECF pp. 20-23 (footnotes omitted).)

Again, Floyd does not rebut, by clear and convincing evidence, the Nebraska state courts' findings that any of the jurors were unfairly biased against him. The Nebraska state courts' findings of fact and conclusions of law are reasonable and entitled to deference under the statutory standard of review that applies to factual and legal conclusions reached by the state courts. In addition, Floyd has not argued, much less established, that the state courts' decisions were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U .S.C. § 2254(d)(1), or that the state courts reached "a decision that was based on an unreasonable determination of the facts in light of the evidence" 28 U.S.C. § 2254(d)(2).

### 4. Claim One, Subpart (17)

In Claim One, Subpart (17), Floyd claims that trial counsel was ineffective because he prohibited Floyd from testifying. (Filing No. 127 at CM/ECF pp. 27, 32.) The court construes this claim as corresponding to Floyd's postconviction claim that trial counsel was ineffective for advising Floyd not to take the stand. The state district court and the Nebraska Supreme Court considered and rejected this argument. Specifically, the state district court held as follows:

> Defendant devotes two pages of this 160 page petition to his claim that counsel was ineffective in advising him not to testify. Notably in the allegations set forth by Defendant, he fails to state that he told counsel he wished to testify or what counsel said when advising Defendant not to testify. While not a formal advisory, this Court notes that counsel stated on the record that Defendant "has the total, absolute, unfettered right to testify or not testify. He can make that call." (BOE 218:19-21). Also, Defendant was a convicted felon at the time of trial and the Nebraska Supreme Court has held that it is a reasonable trial strategy to advise a client not to testify when he or she is a convicted felon. *State v. Journey*, 207 Neb. 717 (1981). Further, a review of the facts Defendant alleges he would have testified about at trial reveal the testimony would have been cumulative to other evidence at trial or

would not have changed the outcome of the trial. In fact, Defendant does not even claim he would have testified that he did not commit the murder. These allegations are insufficient to warrant an evidentiary hearing.

Helpful is the following from *U.S. v. Webber*, 208 F.3d 545, 551 (6th Cir. 2000):

> Although the ultimate decision whether to testify rests with the defendant, when a tactical decision is made not to have the defendant testify, the defendant's assent is presumed. *Joelson*, 7 F.3d at 177. This is so because the defendant's attorney is presumed to follow the professional rules of conduct and is "strongly presumed to have rendered adequate assistance" in carrying out the general duty "to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Strickland v. Washington*, 466 U.S. 668, 688-90, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984). Barring any statements or actions from the defendant indicating disagreement with counsel or the desire to testify, the trial court is neither required to sua sponte address a silent defendant and inquire whether the defendant knowingly and intentionally waived the right to testify, nor ensure that the defendant has waived the right on the record. *Joelson*, 7 F.3d at 177.

Following the law set forth in *Webber*, the court in *Hodge v. Haeberlin*, 579 F.3d 627 (6th Cir. 2009) denied habeas corpus relief without an evidentiary hearing:

> A defendant is presumed to have waived his right to testify unless the record contains evidence indicating otherwise. *United States v. Webber*, 208 F.3d 545, 551 (6th Cir. 2000). A contrary rule would require courts to hold an evidentiary hearing any time a defendant who did not

testify at trial filed an after-the-fact statement saying that he wanted to testify but was prevented from doing so. Therefore the state court's refusal to hold an evidentiary hearing cannot supply cause for Hodge's failure to plead this claim properly. Hodge also does not demonstrate prejudice, because he does not show how his testimony would have altered the outcome of his case.

([Filing No. 10-6 at CM/ECF pp. 112-13](#); *see also* [Filing No. 11-11 at CM/ECF p. 35](#).)

Similarly, the Nebraska Supreme Court considered and rejected this claim in its order affirming the state district court's denial of postconviction relief. The court wrote:

Floyd alleges that trial counsel was ineffective for advising him to not testify. Floyd lists several things he would have testified to, including his relationship with Vickers and Davis, that he was asked by three men in a black SUV with Missouri license plates where Thomas (although it is unclear if Floyd actually means Davis' incarcerated brother instead of Thomas) was the day before the shooting, that Thomas was likely targeted, and he would have testified to his alibi. Importantly, Floyd does not state that he would have testified to his own innocence.

Defense counsel's advice to waive the right to testify can present a valid claim of ineffective assistance in two instances: (1) if the defendant shows that counsel interfered with his or her freedom to decide to testify or (2) if counsel's tactical advice to waive the right was unreasonable.

Floyd does not plead that he was told to not testify by counsel and does not allege facts that demonstrate that he in fact wanted to testify at the time of trial. Further, Floyd does not explain why the strategic decision to not have Floyd testify was unreasonable. Therefore, Floyd has failed to properly plead a valid claim for ineffective assistance of counsel.

Additionally, Floyd fails to plead how his testimony would have changed the outcome of the case. The only possible exculpatory evidence he would have testified to was his alibi. But his alibi had already been elicited by the examination of Ruth Buie and he does not establish how his testimony would have strengthened his alibi. From our review of the record, it is clear that his proposed testimony would not have altered the outcome of his case.

([Filing No. 109-1 at CM/ECF pp. 28-29](#) (footnote omitted).)

An accused has a federal constitutional right to testify on his own behalf at his criminal trial. *Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987). "Because the right to testify is a fundamental constitutional guarantee, only the defendant is empowered to waive the right" and that waiver must be made voluntarily and knowingly. *United States v. Bernloehr*, 833 F.2d 749, 751 (8th Cir. 1987); *accord United States v. Ward*, 598 F.3d 1054, 1059 (8th Cir. 2010). A defendant's waiver of this right must be made knowingly and voluntarily. *Bernloehr*, 833 F.2d at 751. The Eighth Circuit Court of Appeals has held that a knowing and voluntary waiver of the right may be found based on a defendant's silence when his counsel rests without calling him to testify. *Id.* at 751-52. The Eighth Circuit stressed that under such circumstances the defendant must act "affirmatively" rather than apparently "acquiesc[ing] in his counsel's advice that he not testify, and then later claim[ing] that his will to testify was overcome." *Id.* (internal quotation omitted).

A trial counsel's advice to the defendant to waive the right to testify can present a valid claim of ineffective assistance if the defendant shows that counsel interfered with his or her freedom to decide to testify or if counsel's tactical advice to waive the right was unreasonable. *See United States v. Teague*, 953 F.2d 1525, 1534-35 (11th Cir. 1992) (citing *Strickland*, 466 U.S. at 687-88).

Where a state court's findings of the attorney's advice regarding the right to testify and of the acceptance of counsel's advice are clearly supported by the record,

a federal habeas court should "not second guess them." *Frey v. Schuetzle*, 151 F.3d 893, 898 (8th Cir. 1998) (pre-AEDPA federal habeas proceeding). Eighth Circuit case law supports a conclusion that an attorney's advice that a defendant should not testify due to prior convictions is not ineffective assistance of counsel. *Johnson v. Lockhart*, 921 F.2d 796, 800 (8th Cir. 1990) (due to an attorney's discretion to advise a client whether he should testify on his behalf, attorney's advice not to testify due, in part, to prior convictions may "at worst be called bad trial strategy, not constitutionally deficient legal performance"); *Drake v. Wyrick*, 640 F.2d 912, 915 (8th Cir. 1981) (trial attorney's advice that the defendant should not testify due, in part, to prior convictions was a matter of trial strategy and not a ground for finding ineffective assistance).

Here, Floyd does not rebut, by clear and convincing evidence, the Nebraska state courts' findings that: trial counsel did not interfere with Floyd's freedom to decide to testify; trial counsel's tactical advice to waive that right was reasonable; and Floyd failed to establish that his testimony would have changed the outcome of the case. The Nebraska state courts' findings of fact and conclusions of law are reasonable and entitled to deference. In addition, Floyd has not argued, much less established, that the state courts' decisions were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U .S.C. § 2254(d)(1), or that the state courts reached "a decision that was based on an unreasonable determination of the facts in light of the evidence" 28 U.S.C. § 2254(d)(2). Hence, this claim is denied.

### 5. Claim One, Subpart (18)

In Claim One, Subpart (18), Floyd argues that trial counsel was ineffective because he failed to subpoena Shantelle Vickers' medical records to impeach her testimony at trial about Floyd's acts of domestic violence against her. (Filing No. 127 at CM/ECF p. 35.) Both the state district court and the Nebraska Supreme Court

adjudicated and rejected this argument on the merits and did so under the two-prong *Strickland* standard. The state district court stated:

> Defendant alleges counsel was ineffective in failing to obtain medical records by having a medical release waiver signed by Shantelle Vickers or by subpoenaing records from Theresa Gregg. The record refutes these allegations. Counsel had an investigator attempt to locate Shantelle Vickers to sign a medical release, but was unsuccessful. (BOE 1525:18- 1529:24). *See Davlin*, 277 Neb. at 983 (finding counsel not ineffective when subpoenas were issued, but not successfully served [on] the witness). Further, certain medical records were received into evidence relating to altercations with Defendant and others had been subpoenaed. (Ex. 103; BOE 1517:11-18). Additionally, counsel had Theresa Gregg testify at length about mandatory reporting procedures for domestic violence to attack the credibility of . . . Shantelle Vickers' testimony. (BOE 1513:19-1521:3).

(Filing No. 10-6 at CM/ECF p. 110.)

On appeal, the Nebraska Supreme Court affirmed the state district court's denial of this claim. The court wrote:

> Floyd argues that his trial counsel was ineffective because counsel failed to subpoena Vickers and Theresa Gregg, the clinical manager of the emergency department at Creighton University Medical Center, to bring medical records relating to the alleged domestic abuse of Vickers by Floyd. Floyd argues that this would have allowed counsel to impeach Vickers on her claims that Floyd was a violent boyfriend.
>
> First, as with Traeshawn, the record indicates that counsel did attempt to subpoena Vickers for the medical records, but could not find her. This indicates that counsel was not deficient.
>
> Second, Floyd fails to allege why the medical records would have been exculpatory evidence. At best—and his brief concedes this—the medical records would have discredited Vickers' testimony about being

abused by Floyd. Such evidence is not exculpatory and Floyd has failed to properly plead prejudice.

Third, the record affirmatively establishes that Floyd was not prejudiced by the failure to subpoena the medical records. During the cross examination of Vickers, the record indicates extensive questioning on what her alleged injuries were and on why she failed to have medical records to prove such injuries. Additionally, Gregg was a witness for Floyd and testified that she was required by law to report domestic abuse. This was elicited to demonstrate that absence of a police report indicated that Vickers never sought medical attention. This called into question Vickers' testimony that she had been hospitalized by Floyd's abuse. This is exactly the evidence Floyd believes would have been elicited if trial counsel had properly subpoenaed the medical records. Therefore, the record affirmatively establishes that Floyd was not prejudiced by this alleged error.

For the three reasons stated, this argument is without merit.

([Filing No. 109-1 at CM/ECF pp. 18-19](#).)

Floyd did not rebut, by clear and convincing evidence, the Nebraska state courts' findings of fact on this issue, nor did he make any effort to do so. Both the state district court and the Nebraska Supreme Court reviewed the evidence and determined, based on *Strickland*, that trial counsel's conduct was not deficient, and that Floyd was not prejudiced by trial counsel's failure to subpoena Shantelle Vickers' medical records. Indeed, trial counsel called into question Vickers' testimony that she had been hospitalized by Floyd's abuse. Thus, the medical records would have been cumulative and would not have changed the outcome of trial. *See Wong*, 558 U.S. at 22-23. Floyd did not argue, much less establish, that the state courts' decisions on this issue were based on an unreasonable determination of the facts in light of the evidence or that they were contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. Thus, Floyd is not entitled to relief on this claim.

### 6.  Claim One, Subpart (34)

In Claim One, Subpart (34), Floyd asserts that trial counsel was ineffective for failing to object to prosecutorial misconduct during closing arguments and the direct examination of Shantelle Vickers. (Filing No. 127 at CM/ECF pp. 46-48.)

In reviewing prosecutorial misconduct claims, the narrow issue that the federal habeas court may consider is whether there was a violation of due process, and not whether there was misconduct under the court's broad exercise of supervisorial power. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). The test is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The court must distinguish ordinary trial error of a prosecutor from that sort of egregious misconduct which amounts to a constitutional violation of due process. *Smith v. Phillips*, 455 U.S. 209, 221 (1982). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Id.* at 219. Moreover, determining whether prosecutorial misconduct occurred during closing argument requires an examination of the entire proceedings so that the prosecutor's remarks may be placed in the proper context. *Boyde v. California*, 494 U.S. 370, 384-85 (1990).

With respect to Floyd's assertion that trial counsel was ineffective for failing to object to the prosecutor's improper closing arguments, both the state district court and the Nebraska Supreme Court rejected the claim. The state district court stated:

> Defendant alleges counsel failed to object to certain portions of the State's closing argument. In assessing allegations of prosecutorial misconduct in closing arguments, a court first determines whether the prosecutor's remarks were improper and then it must decide[] what prejudicial effect those improper remarks impact the defendant's right to a fair trial. *State v. Balvin*, 18 Neb. App. 690, 791 N.W.2d 352

49

(2010). Here, Defendant cites portions of the record, but provides only conclusory allegations as to why these portions of the closing argument were improper or how they impacted Defendant's right to a fair trial. Further, a review of the entirety of the State's closing argument in light of the evidence adduced at trial reveals there were no improper comments or that Defendant's right to a fair trial was impacted. Thus, the record refutes Defendant suffered any prejudice. *Balvin*, *supra* (although counsel failed to object to closing arguments, defendant suffered no prejudice and counsel was not ineffective when the argument was proper and based on the evidence).

(Filing No. 10-6 at CM/ECF p. 111.) The Nebraska Supreme Court also rejected the argument, writing as follows:

Floyd argues that his trial counsel was ineffective for failing to object to improper comments made by the prosecutor during closing arguments. First, Floyd points to the prosecutor's argument that Vickers could identify Floyd without seeing his face because all of the jurors know someone they could identify by their body mannerisms. Floyd, without specification, claims such a statement was improper. Second, Floyd finds impropriety in the prosecution[']s statement that "I'm just telling you that William Floyd was not over at Ruth Buie's house the night that he killed Destiny Davis." Floyd believes that it was improper for the prosecutor to share his beliefs with the jury.

Third, Floyd argues the prosecution's statement that "(h)er sister is murdered, shot in the house while she's there, dies on the floor of the living room." He alleges this is a misstatement because she actually was pronounced dead at the hospital. Fourth, he complains that the prosecutor argued that Vickers' identified the shooter as Floyd in the original 911 phone call. He states it was improper because it was never affirmatively established.

Generally, in assessing allegations of prosecutorial misconduct in closing arguments, a court first determines whether the prosecutor's remarks were improper. It is then necessary to determine the extent to which the improper remarks had a prejudicial effect on the defendant's

right to a fair trial. A prosecutor's conduct that does not mislead and unduly influence the jury does not constitute misconduct.

Floyd does not sufficiently explain in his pleading why counsel was deficient for not objecting to each alleged instance of prosecutorial misconduct. He does not affirmatively establish that any of the four statements, taken in the context of the entire trial, were legally improper under our case law. To prove deficiency, Floyd must establish why the objections would have been sustained. Defense counsel is not ineffective for failing to raise an argument that has no merit. Because Floyd failed to establish why the objections would have been sustained, this argument is without merit.

Even if we accepted each statement as improper, we conclude that Floyd has failed to allege prejudice because he does not explain how the prosecutor's closing argument unduly mislead or influenced the jury. He fails to allege that the outcome of this trial would have been different, had his trial counsel objected to these allegedly improper statements. Without properly pleading prejudice, Floyd's argument fails.

(Filing No. 109-1 at CM/ECF pp. 25-27 (footnotes omitted).)

The Nebraska state courts' determinations that Floyd was not denied effective assistance of counsel due to trial counsel's failure to object to the prosecutor's closing arguments were not contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Thus, where the Nebraska state courts reasonably found that the prosecutor's comments did not amount to misconduct, did not mislead the jury, or did not impact Floyd's right to a fair trial, federal habeas relief is not warranted.

With respect to Floyd's argument that trial counsel was ineffective for failing to object to statements made by Vickers during direct examination, the Nebraska Supreme Court stated:

Floyd argues that his counsel should have objected to testimony by Vickers that she had seen Floyd with a gun. Specifically, she testified that prior to October 7, 2003, she had seen the grip of a pistol in Floyd's pocket. Floyd argues that this was a highly prejudicial statement because the handle could have been a water gun or a BB gun.

This argument clearly has no merit. Floyd does not explain on what grounds his trial counsel should have objected and does not provide reasoning as to why such an objection would have been sustained. Defense counsel is not ineffective for failing to raise an argument that has no merit. Additionally, Floyd once again fails to explain how excluding this evidence would have altered the outcome of the trial.

(Filing No. 109-1 at CM/ECF pp. 27-28 (footnotes omitted).)

Floyd has not shown that he was prejudiced by trial counsel's failure to lodge an objection to Vickers' testimony that she had seen Floyd with a gun. Floyd has presented no evidence, absent his own conclusory statements, that failure to object to Vickers' testimony was prejudicial. Considering the weight of the evidence against him, Floyd has not shown that the result of the trial would have been different if trial counsel had objected to Vickers' testimony. Floyd has not demonstrated that the Nebraska Supreme Court's decision denying his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as required by the Supreme Court. Accordingly, under the deferential standards of review mandated by the AEDPA, the court finds Floyd's claim without merit.

### 7. Claim One, Subpart (39)

In Claim One, Subpart (39), Floyd argues that trial counsel was ineffective because he failed to sequester jurors. (Filing No. 131 at CM/ECF p. 10.) The Nebraska Supreme Court considered and rejected this argument in its order affirming the state district court's denial of postconviction relief. The court wrote:

Floyd argues that his counsel should have moved the district court to sequester the jury. According to Floyd, this would have prevented the jurors from being exposed to the news article. We hold that Floyd, once again, failed to allege any specific evidence demonstrating that the outcome of his trial would have been different had the jury been sequestered.

Furthermore, we find that the record affirmatively establishes that such alleged error did not prejudice Floyd. Our opinion on direct appeal clearly establishes that the jurors' exposure to the newspaper did not prejudice Floyd. This claim has no merit.

(Filing No. 109-1 at CM/ECF p. 24.) Notably, on direct appeal, the Nebraska Supreme Court determined as follows:

In his fifth and final assignment of error, Floyd argues that the district court erred in not granting his motion for mistrial or, in the alternative, motion to strike jurors D.W. and F.W. as a result of their exposure to a newspaper article.

Neb. Rev. Stat. § 29-2006 (Reissue 2008) provides in relevant part:

The following shall be good causes for challenge to any person called as a juror or alternate juror, on the trial of any indictment: . . . (2) that he has formed or expressed an opinion as to the guilt or innocence of the accused; *Provided*, if a juror or alternate juror shall state that he has formed or expressed an opinion as to the guilt or innocence of the accused, the court shall thereupon proceed to examine, on oath, such juror or alternate juror as to the ground of such opinion; and if it shall appear to have been founded upon reading newspaper statements, communications, comments or reports, or upon rumor or hearsay, and not upon conversations with witnesses of the transactions or reading reports of their testimony or hearing them testify, and the juror or alternate juror shall say on oath that he feels able, notwithstanding such

53

opinion, to render an impartial verdict upon the law and the evidence, the court, if satisfied that such juror or alternate juror is impartial and will render such verdict, may, in its discretion, admit such juror or alternate juror as competent to serve in such case. . . .

In this case, Floyd's argument that the motions to strike D.W. and F.W. should have been granted is without merit. There is simply no evidence to suggest that D.W. or F.W. had even formed an opinion about Floyd's guilt. At most, there is some evidence that both D.W. and F.W. saw Floyd's name in a newspaper headline and, in accordance with the district court's admonition, "immediately disregard[ed]" it. We therefore conclude that the district court did not abuse its discretion in denying Floyd's motion to strike these two jurors.

Nor did the district court abuse its discretion in denying Floyd's motion for mistrial. In order for a verdict to be set aside because of the prejudicial effect of newspaper accounts on jurors, there must be evidence presented that the jurors read newspaper accounts and that the accounts were unfair or prejudicial to the defendant. In order for jury misconduct to be the basis for a new trial, the misconduct must not only occur but it must be prejudicial to the defendant. A criminal defendant claiming jury misconduct bears the burden of proving, by a preponderance of the evidence, (1) the existence of jury misconduct and (2) that such misconduct was prejudicial to the extent that the defendant was denied a fair trial.

This court's decision in *State v. Anderson* is helpful. In *Anderson*, we held that jury misconduct occurred when several jurors read a newspaper headline about the defendant's retrial and then discussed the headline with other jurors. Despite this misconduct, however, we concluded that the defendant failed to meet his burden of showing that his right to a fair trial was prejudiced by the misconduct. We noted:

> The examination of the jurors in this cause by the trial court and both counsel failed to disclose either directly or inferentially that any of the jurors had been prejudiced by their exposure to the headline or subhead in question. Even

though three of the jurors acknowledged that the subhead stated that the instant cause was a retrial, none of the jurors exhibited any knowledge as to the circumstances of the retrial or whether the first trial was terminated prior to its conclusion or was reversed on appeal. The mere use of the word retrial, without further explanation, does not automatically connote that a defendant was convicted of particular crimes in a prior trial, nor does it necessarily mean that a prior trial had reached its completion. Simply put, none of the jurors testified that they had any knowledge regarding a prior conviction or as to why [the defendant] was being granted a new trial.

As an initial matter, we question whether D.W.'s and F.W.'s actions in reading a portion of the headline of the article in question constituted jury misconduct. Unlike the jurors in *Anderson*, who had the contents of the headline brought to their attention and then proceeded to discuss it, there is no evidence that suggests that D.W. or F.W. discussed the contents of the headline with anyone. In fact, the record establishes that F.W. threw the newspaper away "as fast as I probably have in my life." And D.W. indicated that he saw the article's headline and "just looked down" to avoid seeing anything further.

Moreover, we conclude that Floyd has failed to meet his burden of showing that his right to a fair trial was prejudiced by the alleged misconduct. We noted in *Anderson* that the "mere use of the word retrial" was not, on its own, prejudicial. And as in *Anderson*, there is nothing in the record that would suggest either D.W. or F.W. had any knowledge as to Floyd's prior conviction or as to why he was being granted a new trial. In fact, with respect to F.W., there is no evidence that she was even aware that Floyd's trial was a retrial. We therefore also conclude that the district court did not abuse its discretion in denying Floyd's motion for mistrial.

Floyd's fifth and final assignment of error is without merit.

*Floyd*, 277 Neb. at 513-16, 763 N.W.2d at 102-03. (Filing No. 9-5 at CM/ECF pp. 11-13.)

Floyd has failed to show that he was prejudiced by the failure to sequester the jury and has cited no authority necessitating sequestration in this case. The record generated did not support a finding that media coverage of the case was so outrageous that the trial was "utterly corrupted." *Dobbert v. Florida*, 432 U.S. 282, 303 (1977). In addition, Floyd did not rebut, by clear and convincing evidence, the Nebraska Supreme Court's findings that the jurors' exposure to a newspaper article was not prejudicial, nor did he make any effort to do so. Again, the court must grant substantial deference to the Nebraska Supreme Court's findings of fact and conclusions of law. Floyd has failed to establish that the Nebraska Supreme Court's decisions on sequestration and juror exposure to media coverage were based on an unreasonable determination of the facts in light of the evidence or that it was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. Accordingly, Floyd is not entitled to habeas relief on Claim One, Subpart (39).

### 8. Remaining Subparts of Claim One

To the extent any of the remaining subparts of Claim One are subsumed within the ineffective assistance of trial counsel claims discussed by the Nebraska Supreme Court, they are denied. Floyd did not rebut, by clear and convincing evidence, the Nebraska Supreme Court's findings or establish that the Nebraska Supreme Court's rejection of these claims was based on an unreasonable determination of the facts in light of the evidence or that it was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.

To the extent any of the remaining subparts of Claim One were not presented in one complete round of review by the Nebraska state courts, *see Akins*, 410 F.3d at 454-55, or to the extent the Nebraska Supreme Court did not reach the merits of any of the remaining subparts based on Floyd's failure to properly plead prejudice or his failure to present the claims to the district court, these claims are procedurally

defaulted, *see Hunt v. Houston*, 563 F.3d 695, 703 (8th Cir. 2009) ("Federal courts generally will not review claims that a state court has refused to consider because of the petitioner's failure to satisfy a state procedural requirement"); *Sing v. Frakes*, No. 8:15CV134, 2016 WL 3248244, at \*5 (D. Neb. June 13, 2016) (same); *Ildefonso v. Gage*, No. 4:13CV3110, 2016 WL 1092468, at \*9 (D. Neb. Mar. 21, 2016), *certificate of appealability denied* (Sept. 15, 2016) (the Nebraska Supreme Court's decision to refuse to consider claims that alleged only conclusions of fact or law was based on a firmly established state procedural rule; in Nebraska, if a postconviction motion alleges only conclusions of fact or law, then the court is not required to grant an evidentiary hearing); *State v. Dragon*, 843 N.W.2d 618, 623 (Neb. 2014) ("If a postconviction motion alleges only conclusions of fact or law, or if the records and files in the case affirmatively show that the defendant is entitled to no relief, the court is not required to grant an evidentiary hearing"); *Deckard*, 722 N.W.2d at 63 ("An appellate court will not consider as an assignment of error a question not presented to the district court for disposition through a defendant's motion for postconviction relief."). The Nebraska courts would not entertain a successive postconviction motion based on these same claims and any successive postconviction motion filed by Floyd would also be barred by Nebraska's statute of limitations. Thus, the claims are now procedurally defaulted, not merely unexhausted.

Even assuming Floyd were able to establish adequate cause for any procedural default of the remaining ineffective assistance of trial counsel claims set forth in Claim One, Floyd has failed to show that any of the claims have merit. The court has independently analyzed the arguments raised in each of the subparts of Claim One. The court has concluded that all the arguments are conclusory, based only on general assertions of prejudice or no assertions of prejudice at all, or are meritless. To discuss the court's reasoning for each of these arguments would unduly prolong the length of this opinion, and it is unnecessary in light of the especially deferential standard of review under *Strickland*.

## B. Claim Two

In Claim Two, Floyd alleges various ways in which appellate counsel was ineffective.

As to the ineffective assistance of appellate counsel claims that Floyd raised in his postconviction appeal, the Nebraska Supreme Court wrote:

> Floyd argues that his appellate counsel was ineffective for failing to raise 14th Amendment claims on direct appeal. Floyd lists the following direct appeal claims that were not argued: lack of jurisdiction, use of false evidence and witnesses, the State's failure to disclose impeachment evidence (*Brady* material), failure to give proper notice of the nature and cause of accusations against defendant, improper jury instructions[,] failure to prove guilt beyond a reasonable doubt, incorrect elements for first degree murder and manslaughter of an unborn child, presenting evidence designed to inflame the jury, the trial court erred in accepting the jury's guilty verdict when there was no proof of venue, trial court erred in overruling counsel's motion to remove for cause juror who had formed an opinion about the defendant being guilty, erroneous jury instructions, and insufficient evidence in the second amended information on counts I, II, and III. Floyd continues to cite a handful of cases in his motion for postconviction relief but fails to tie those cases to specific direct appeal claims.

> When analyzing a claim of ineffective assistance of appellate counsel, courts usually begin by determining whether appellate counsel's failure to bring a claim on appeal actually prejudiced the defendant. That is, courts begin by assessing the strength of the claim appellate counsel failed to raise. Counsel's failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal.

> Floyd has failed to establish that there is a reasonable probability that the inclusion of any of these assignments of error on his direct appeal would have changed his direct appeal. All of the alleged errors by appellate counsel are meaningless to this court without more discussion

and context from Floyd. For instance, we cannot guess as to why Floyd believes that the trial court lacked jurisdiction and venue in this case. For these reasons, we reject Floyd's claims for ineffective assistance of appellate counsel because he has failed to properly allege how he was prejudiced.

(Filing No. 109-1 at CM/ECF pp. 29-31 (footnotes omitted).)

The Nebraska Supreme Court's decision to refuse to consider claims that alleged only conclusions of fact or law was based on a firmly established state procedural rule. That is, in Nebraska, if a postconviction motion alleges only conclusions of fact or law, then the court is not required to grant an evidentiary hearing. *See, e.g., Dragon*, 843 N.W.2d at 623; *State v. Fox*, 840 N.W.2d 479, 485 (Neb. 2013); *State v. Baker*, 837 N.W.2d 91, 96 (Neb. 2013); *State v. Marks*, 835 N.W.2d 656, 661 (Neb. 2013); *State v. Branch*, 834 N.W.2d 604, 607 (Neb. 2013). Therefore, even if all subparts of Claim Two were raised in Floyd's postconviction appeal, they are procedurally defaulted pursuant to an independent and adequate state procedural rule. *See Hunt*, 563 F.3d at 703; *Sing*, No. 8:15CV134, 2016 WL 3248244, at *5; *Ildefonso*, No. 4:13CV3110, 2016 WL 1092468, at *9. All subparts of Claim Two are now procedurally defaulted, not unexhausted, because the Nebraska courts would not entertain a successive postconviction motion based on these claims. Furthermore, any successive postconviction motion filed by Floyd would also be barred by Nebraska's statute of limitations.

Floyd has not demonstrated cause or prejudice for the default. Floyd cannot rely on *Martinez* to excuse the procedural default because *Martinez* does not apply to defaulted ineffective assistance of appellate counsel claims. *Davila v. Davis*, 137 S. Ct. 2058, 2063 (2017); *Dansby v. Hobbs*, 766 F.3d 809, 833 (8th Cir. 2014). Moreover, as discussed below, Floyd has not shown that he is actually (meaning factually) innocent or that some miscarriage of justice took place. The court has carefully examined the record; the evidence was sufficient to convict Floyd beyond a reasonable doubt.

## C.  Claims Three, Four, and Six

The court agrees with the Respondents that Claims Three, Four, and Six are procedurally defaulted because Floyd did not specifically assign and argue these claims to the Nebraska Supreme Court either in his direct appeal after retrial or in his postconviction appeal. The claims are now procedurally defaulted, not unexhausted. He cannot raise them in a successive postconviction motion. Furthermore, any successive postconviction motion filed by Floyd would also be barred by Nebraska's statute of limitations.

To the extent that Floyd argues that the procedural default should be excused because counsel was deficient in failing to raise the constitutional claims on direct appeal, "[a] claim of ineffective assistance of counsel must be presented to the state court as an independent claim before it may be used to establish cause for procedural default or denominated as a ground for habeas relief." *Leggins v. Lockhart*, 822 F.2d 764, 768 n.5 (8th Cir. 1987). An ineffective assistance of counsel claim asserted as cause for another procedurally defaulted federal claim can itself be procedurally defaulted, and, unless the state prisoner can satisfy the cause and prejudice standard for the procedurally defaulted ineffective assistance of counsel claim, that claim cannot serve as cause for another procedurally defaulted claim. *Edwards v. Carpenter*, 529 U.S. 446, 451-53 (2000).

As discussed above, Floyd did assert in his postconviction relief proceedings claims of ineffective assistance of appellate counsel as to some but not all subparts of Claim Three. With respect to those subparts of Claim Three that were raised as ineffective assistance of appellate counsel claims, the court determined above that those claims are procedurally defaulted and that Floyd has not demonstrated cause or prejudice for the default. Therefore, Floyd cannot rely on those ineffective assistance of appellate counsel claims to overcome the procedural default. *See Edwards*, 529 U.S. at 451-53. In addition, any subpart of Claim Three that was not

raised as an independent ineffective assistance of appellate counsel claim in the Nebraska state courts is defaulted. *See Leggins*, 822 F.2d at 768 n.5.

Floyd did not assert an independent ineffective assistance of appellate counsel claim for Claim Six in his postconviction relief proceedings. Therefore, Floyd cannot establish cause for the procedural default. *See id*.

Although Claim Four is also procedurally defaulted, the court nonetheless concludes that it is without merit. Floyd has made only conclusory allegations that counsel "failed to maintain sufficient client contact." (Filing No. 127 at CM/ECF pp. 51-54.) Floyd admits that counsel did in fact communicate, just not to the extent he wished. (*Id.*) Floyd does not develop this argument by providing any explanation of how, but for this alleged lack of communication, the result of trial would have been different. Accordingly, even assuming this claim is not procedurally defaulted, it is without merit.

## D.  Claim Seven

In Claim Seven, Floyd has presented a claim of actual innocence as a gateway through any type of procedural default. (Filing No. 131 at CM/ECF p. 15.)

To obtain review of an otherwise procedurally barred claim, a petitioner must satisfy a two-part test: (1) the "allegations of constitutional error must be supported with new reliable evidence not available at trial"; and (2) "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Nash v. Russell*, 807 F.3d 892, 899 (8th Cir. 2015) (citing *Schlup*, 513 U.S. at 327-28); *accord Amrine v. Bowersox*, 238 F.3d 1023, 1029 (8th Cir. 2001). In *Schlup*, the Court provided several examples of "reliable evidence," including "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." 513 U.S. at 324. The Eighth Circuit Court of Appeals has further defined "new evidence" as evidence that "was not available at trial and could not have been

discovered earlier through the exercise of due diligence." *Amrine*, 238 F.3d at 1028; *see also Kidd v. Norman*, 651 F.3d 947, 951-53 (8th Cir. 2011) (discussing how various circuits have defined "new" and approving of the *Amrine* definition). In *McQuiggin*, the Supreme Court cautioned "that tenable actual-innocence gateway pleas are rare." 569 U.S. at 386.

Floyd has presented no new, reliable evidence of actual innocence in this case. He provides no "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence," *Schlup*, 513 U.S. at 324, to demonstrate his claim's credibility. Moreover, there is no indication that any of the evidence he has presented is new information that "was not available at trial and could not have been discovered earlier through the exercise of due diligence." *Amrine*, 238 F.3d at 1028. Indeed, Floyd does nothing more than rehash the evidence and arguments presented at retrial. (*See* Filing No. 131 at CM/ECF pp. 2-9.) Thus, Floyd has not satisfied the requisite elements to excuse his procedurally defaulted claims through any "gateway" claim of actual innocence.

## E.  Access to the Courts

Citing cases involving access to the courts and prison law libraries, Floyd argues that the State "interfered or hindered the exhaustion process." (Filing No. 187 at CM/ECF p. 1.) The court understands that Floyd is arguing that he has shown cause for his failure to properly raise his claims because he was denied his constitutional right of meaningful access to the courts during his postconviction proceedings. Although "it is conceivable that the denial of access to the courts may be imputed to the State and thus constitute cause in some circumstances," *Lamp v. Iowa*, 122 F.3d 1100, 1105 (8th Cir. 1997), the court concludes that Floyd did in fact have meaningful access to the postconviction court and therefore has failed to establish cause to excuse his procedural default.

Prisoners have a constitutional right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821 (1977), *overruled in part by Lewis v. Casey*, 518 U.S. 343 (1996). In the aftermath of *Bounds*, the Supreme Court in *Lewis* narrowed the scope of the right of access to the courts. In *Lewis*, the Court made clear that *Bounds* did not establish "an abstract, freestanding right to a law library or legal assistance" but rather emphasized that meaningful access is the touchstone of the constitutional right of access doctrine. 518 U.S. at 350. Importantly, the Court specifically disclaimed excerpts in *Bounds* suggesting that states are required to enable prisoners "to discover grievances and to litigate effectively once in court." 518 U.S. at 354 (emphasis omitted). The Court concluded its narrowing of *Bounds* with this statement:

> In other words, *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Id.* at 355 (emphasis in original).

Recognizing that *Lewis* lays out the framework for analyzing access-to-courts claims brought by inmates, the Eighth Circuit has held "the right of access to the courts guarantees an inmate the ability to file lawsuits that directly or collaterally attack the inmate's sentence or that challenge the conditions of the inmate's confinement, but it does not extend to the right to 'discover grievances' or to 'litigate effectively once in court.'" *Cody v. Weber*, 256 F.3d 764, 76-68 (8th Cir. 2001) (quoting *Lewis*, 518 U.S. at 354-55). "The right of access to the courts is satisfied if the prisoner has the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts." *Zink v. Lombardi*, 783 F.3d 1089, 1108

(8th Cir. 2015) (en banc) (per curiam) (citation omitted). Importantly, the Eighth Circuit has specifically held that in order to state an access-to-courts claim, an inmate "must establish the state has not provided an opportunity to litigate a claim challenging the prisoner's sentence or conditions of confinement in a court of law which resulted in actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim." *Williams v. Hobbs*, 658 F.3d 842, 851–52 (8th Cir. 2011).

Floyd makes no specific allegations regarding his inability to comply with state procedural rules due to his incarceration. Moreover, it is evident that Floyd has been able to bring legal challenges as is evident from his amended postconviction motion filed in state district court and the numerous and extensive filings in this court. The only specific complaint that Floyd mentions is that the prison interfered with his ability to complete his habeas brief and exhibit list "to illustrate more claims of prosecutorial misconduct, judicial misconduct, and ineffective assistance of counsel" by taking his "legal mail/material and has determine[d] that the remaining 50% is not part of [his] litigation for [his] Habeas Corpus." (Filing No. 187 at CM/ECF p. 65.) Floyd has not identified the legal materials that were taken from him or how it affected his ability to file his brief with this court. In fact, the record reflects that prison officials returned to Floyd those legal materials that were related to this habeas case (Filing No. 181-1), and this court gave Floyd additional time to complete his brief once the papers were returned (Filing No. 182). Floyd simply has not established that the prison interfered with his ability to raise his postconviction claims in state court. Thus, Floyd has not established cause for his procedural default.

## VI.  CERTIFICATE OF APPEALABILITY

A petitioner cannot appeal an adverse ruling on his petition for writ of habeas corpus under § 2254 unless he is granted a certificate of appealability. 28 U.S.C. § 2253(c)(1); 28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22(b)(1). The standards for

certificates (1) where the district court reaches the merits or (2) where the district court rules on procedural grounds are set forth in *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). The court has applied the appropriate standard and determined that Floyd is not entitled to a certificate of appealability.

IT IS THERFORE ORDERED that the Petition for Writ of Habeas Corpus (Filing No. 127 & Filing No. 131) is denied and dismissed with prejudice. No certificate of appealability has been or will be issued. Judgment will be issued by separate document.

Dated this 16th day of September, 2019.

BY THE COURT:

s/ *Richard G. Kopf*
Senior United States District Judge